## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| BARTON GERNANDT, JR., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SANDRIDGE ENERGY, INC., TOM L. WARD, STEPHEN C. BEASLEY, JAMES D. BENNETT, JIM J. BREWER, EVERETT R. DOBSON, WILLIAM A. GILLILAND, DANIEL W. JORDAN, EDWARD W. MONEYPENNY, ROY T. OLIVER, JR., JEFFREY S. SEROTA, J. MICHAEL STICE, ALAN J. WEBER, DAN A. WESTBROOK, MARY L. WHITSON, ROBERT SCOTT GRIFFIN, CINDY GREEN, THE EMPLOYEE BENEFITS AND COMPENSATION COMMITTEE OF SANDRIDGE ENERGY, INC., THE INVESTMENT COMMITTEE OF SANDRIDGE ENERGY, INC. and JOHN DOES 1-10.<br><br>Defendants. | **CIVIL ACTION NO.**: CIV-15-834-D<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Barton Gernandt, Jr. ("Plaintiff"), on behalf of the SandRidge Energy, Inc., 401(k) Plan (the "Plan"), himself, and a class of similarly situated participants and beneficiaries of the Plan (the "Participants"), alleges as follows:

### INTRODUCTION

1.      SandRidge Energy, Inc. ("SandRidge" or the "Company"), headquartered in Oklahoma City, Oklahoma, derives substantially all of its revenue from the sale of oil and

natural gas which it explores for, develops, and produces.  *See* SandRidge Annual Report for Year-End 2014,  at 3, 14 (filed February 27, 2015) ("2014 Form 10-K").

2.      SandRidge provides its employees the opportunity to save for retirement through the Plan – a defined contribution plan.  *See* Plan Annual Report for Year-End 2014, at 6 (filed June 24, 2015) ("2014 Form 11-K").

3.      In essence, defined contribution retirement plans confer tax benefits on participating employees to incentivize saving for retirement.  Here, for example, the Summary Plan Description for the Plan states that the "Plan has been adopted to provide [participants] with the opportunity to save for retirement on a tax-advantaged basis."[1]  An employee participating in a defined contribution plan may have the option of purchasing the common stock of his or her employer for part of his or her retirement investment portfolio.  In this case, Participants, through the Plan, had the option of purchasing the common stock of SandRidge ("SandRidge Stock" or "Company Stock").

4.      Plaintiff is a former employee of SandRidge and was a Participant in the Plan during the Class Period (August 2, 2012 to the present), during which time the Plan, and Plaintiff's individual account in the Plan, held interests in SandRidge Stock.

5.      Prior to January 1, 2015, the Plan's investment options, including Company Stock, were selected by the Employee Benefits and Compensation Committee of SandRidge, Inc. ("Benefits Committee").[2]  Effective, January 1, 2015, the "Investment Committee" performed

---

[1]  *See* Summary Plan Description, Effective January 1, 2015 ("2015 SPD") (attached hereto as Exhibit 1) at 1, SRidge_00289.

[2]  *See* Trust Agreement For The SandRidge Energy, Inc. 401(k) Plan, dated December 1, 2010 ("2010 Trust Agreement") (attached hereto as Exhibit 2), at 2, SRidge_00077.

the same duties as the Benefits Committee.[3]  Members of the Benefits Committee and/or the

Investment Committee are appointed, and serve at the pleasure of, the Board of Directors of

SandRidge, Inc.  *See* 2010 Trust Agreement at 2, SRidge_00077.  *See also* 2015 Trust

Agreement at 2, SRdige_00261.[4]

6.    This is a class action brought pursuant to §§ 409 and 502 of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the

Plan's fiduciaries, which include SandRidge and its Board of Directors, the Benefits Committee,

the Investment Committee, and certain individual officers and management-level employees of

SandRidge.

7.    The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C.

§ 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is not a party.

Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is

for the benefit of the Plan and its Participants.

8.    Plaintiff alleges that Defendants, as "fiduciaries" of the Plan, as that term is

defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the

Plan, to Plaintiff, and to the other Participants of the Plan by, *inter alia*, retaining SandRidge

---

[3]  *See also* Trust Agreement For The SandRidge Energy, Inc. 401(k) Plan, dated January 1, 2015 ("2015 Trust Agreement") (attached hereto as Exhibit 3), at 2, SRidge_00261.

[4]  During his investigation, Plaintiff requested that the Plan Administrator provide all of the names of the members of the fiduciary committees of the Plan pursuant to, *inter alia*, ERISA § 104(b)(4), 29 C.F.R. § 2520.104b-1.  The Plan Administrator declined to provide this particular information on the purported basis that the requested information was beyond the purview of ERISA § 104(b)(4), 29 C.F.R. § 2520.104b-1.  Plaintiff believes that after a reasonable opportunity for discovery to obtain any Benefits Committee and Investment Committee charters, meeting minutes, and other relevant information, the aforementioned documents will provide additional evidentiary support for the allegations set forth herein, including with respect to the composition of the Benefits Committee and Investment Committee during the Class Period.  The documents that the Plan Administrator, through its legal representative, did produce pursuant to the 104(b) request are cited and attached herein.

Stock as an investment option in the Plan when a reasonable fiduciary using the "care, skill, prudence, and diligence… that a prudent man acting in a like capacity and familiar with such matters would use" would have done otherwise.  *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

9.      Specifically, Plaintiff alleges in Count I that the Defendants, who were responsible for the investment of the Plan's assets, breached their fiduciary duties to the Plan and the Plan's Participants in violation of ERISA by failing to prudently and loyally manage the Plan's investment in Company securities by:  (1) continuing to offer SandRidge Stock as a Plan investment option when it was imprudent to do so; (2) failing to provide complete and accurate information to Plan Participants regarding the Company's financial condition and the prudence of investing in SandRidge Stock; and (3) maintaining the Plan's pre-existing significant investment in SandRidge Stock when Company Stock was no longer a prudent investment for the Plan.  These actions/inactions run directly counter to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

10.      Plaintiff alleges in Count II that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and the Plan Participants' best interests in mind.

11.      Plaintiff's Count III alleges that certain Defendants, who were responsible for the appointment, monitoring, and removal of the Plan's other fiduciaries, failed to properly inform and monitor the performance of, their fiduciary appointees despite the fact that these Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering SandRidge Stock as an investment option and investing Plan assets in SandRidge Stock when it was no longer prudent to do so.

12.    The thrust of Plaintiff's allegations is that Defendants allowed the investment of the Plan's assets in SandRidge Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle for at least two separate reasons.

13.    First, SandRidge Stock was imprudent in light of circumstances demonstrating SandRidge's dire financial condition which, included among other things, as explained in detail below, a sea-change in the basic risk profile and business prospects of SandRidge caused by: (a) collapse of oil prices which drastically and for the foreseeable future compromised SandRidge's financial health; (b) the Company's deteriorating Altman Z-score ("Z-score") – a financial formula commonly used by financial professionals to predict whether a company is likely to go bankrupt – which indicated that SandRidge was and is in danger of bankruptcy; (c) a crushing debt-load that in and of itself threatens the Company's survival; and (d) other indicia of the Company's financial distress, including numerous downgrades of SandRidge's credit ratings, and a stock price, now trading for pennies, that has remained below $1 per share since June 26, 2015, making it at risk of being delisted from the New York Stock Exchange.

14.    Second, SandRidge Stock was artificially inflated during at least a portion of the Class Period when the Plan was a net-purchaser of SandRidge Stock. During the Class Period, the Company materially overstated the amount of oil being produced and the ratio of oil to natural gas in one of its core holdings referred to as the Mississippian play or Mississippian formation – a geological formation that extends hundreds of miles across northern Oklahoma and south-central Kansas. *See* 2014 Form 10-K at 3. In reality, the Mississippian play held more of the less-profitable natural gas than oil. As a result of the Company's concealment of the truth – that the Mississippian play held much less oil and had a higher natural gas to oil ratio than

publicly acknowledged – SandRidge Stock was artificially inflated and inevitably lost considerable value once the truth began to emerge by late 2012.

15.     SandRidge Stock was artificially inflated during the Class Period for additional reasons.  On November 4, 2014, the Company announced that its previously issued financial statements dating back to 2012 should no longer be relied upon because the Company was improperly accounting for penalties under a service agreement it was party to with Occidental Petroleum Corporation ("Occidental"), a Houston-based oil and gas exploration and production company.  *See* SandRidge Current Report, Form 8-K, filed November 4, 2014.  As a result of this improper accounting, the Company restated its 2013 Annual Report on Form 10-K and its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2014 and June 30, 2014.  As explained below, the change in accounting treatment affected the Company's financials by roughly $8 million of net income per quarter.  The Company itself described these adjustments as material.  Accordingly, during a significant portion of the Class Period, the Company did not accurately portray its financial condition, thus artificially inflating the price of SandRidge Stock.

16.     Thus, in essence, Plaintiff alleges SandRidge Stock was imprudent for Plan Participants' retirement savings during the Class Period because of, *inter alia*, the Company's drastic change in circumstances due to the significant deterioration of the Company's financial condition, as well as the artificial inflation of the Company Stock.  Plan Participants have suffered tens of millions of dollars of losses as the market price of SandRidge Stock has fallen from approximately $6.58 on August 2, 2012, the first day of the Class Period, to $0.63 (both adjusted closes) on July 29, 2015, the most recent trading day preceding the date of this filing - a decline of over ***90%***.

17.     The loss for the Plan and its Participants is especially devastating given the substantial investment of the Plan's assets in Company Stock.   The Company itself acknowledged that the "Plan has invested a significant portion of its assets in Company common stock."   *See* 2013 Form 5500, Noted to Financial Statements, at 13, SRidge_00393.   It noted that Investments in Company Stock included participant and nonparticipant-directed investments for the plan years ended December 31, 2013 and 2012, and constituted approximately 34% and 36% of the Plan's net assets available for benefits as of December 31, 2013 and 2012, respectively. *Id.*

18.     Defendants recognized, or should have recognized, the imprudence of Company Stock as a retirement investment during the Class Period as a result of the above factors, yet took no steps to protect the Plan and its Participants.

19.     ERISA requires fiduciaries to employ appropriate methods to investigate the merits of all plan investments as well as to engage in a reasoned decision-making process, consistent with that of a prudent person acting in a like capacity.   The duty of prudence also requires fiduciaries to monitor the prudence of their investment decisions to ensure that they remain in the best interest of the plan's participants.

20.     The Department of Labor ("DOL") has issued regulations interpreting the duty of prudence.   In order to comply with the duty of prudence, a fiduciary must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties."   29 C.F.R. § 2550.404a-1(b)(1).   "Appropriate consideration,"

according to DOL regulations, includes but is not necessarily limited to "(i) [a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed… to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action."  29 C.F.R. § 2550.404a-1(b)(2).

21.     A fiduciary who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is acting imprudently in violation of ERISA.

22.     Trust law, from which ERISA is derived, clarifies that a "trustee has a duty to the beneficiaries to invest and manage the funds of the trust as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the trust."[5]  *See* Restatement (Third) of Trusts § 90.

23.     When a trustee makes investment decisions, the trustee's conduct is judged using a "prudent investor" standard.  Restatement (Third) of Trusts § 90, at 292.  The trustee must "invest and manage the funds of the trust as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the trust."  *Id.*  "[A] trustee's duties apply not only in making investments but also in monitoring and reviewing investments, which is to be done in a manner that is reasonable and appropriate to the particular investments, courses of action, and strategies involved."  *Id.* comment b, at 295.  Indeed, "[t]he Uniform Prudent

---

[5]   The Restatement (Second) of Trusts, which was effective when ERISA was enacted, states that:  "Except as otherwise provided by the terms of the trust, if the trustee holds property which when acquired by him was a proper investment, but which thereafter becomes an investment which would not be a proper investment for the trustee to make, it becomes the duty of the trustee to the beneficiary to dispose of the property within a reasonable time."  *Id.* at § 231 (1959).  The Uniform Prudent Investor Act (1994), which has been adopted by almost all states, recognizes that "the duty of prudent investing applies both to investing and managing trust assets. . . ."  Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994).  The official comment explains that "'[m]anaging' embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments."  *Id.* § 2 comment.

Investor Act confirms that '[m]anaging embraces monitoring' and that a trustee has 'continuing responsibility for oversight of the suitability of the investments already made.'" *Tibble, et al. v. Edison International et al.*, 135 S. Ct. 1823, 1828 (2015) (quoting The Uniform Prudent Investor Act § 2, Comment, 7B U.L.A. 21 (1995)).

24.     In other words, "[p]rudence focuses on the process for making fiduciary decisions.  Therefore, it is wise to document decisions and the basis for those decisions."[6]  Thus a trustee must "make[] an investigation as to the safety of [an] investment and the probable income to be derived therefrom" and then make a reasonable investment decision based on that investigation.  Restatement (Second) § 227 comment b, at 530.

25.     As similarly summarized in the Third Restatement:  "*Changes in a company's circumstances*, *adaptation to trust- and capital-market developments*, fine-tuning, and the like may, of course, justify the selling and buying of properties as an aspect of a prudent plan of asset allocation and diversification….  This is consistent with the trustee's ongoing duty to monitor investments and to make portfolio adjustments if and as appropriate, with attention to all relevant considerations, including tax consequences and other costs associated with such transactions."  Restatement (Third) § 90 comment e(1) (emphasis added).

26.     Thus, prudent investment management demands, *inter alia*, that Defendants not merely rely upon the fact that the price of SandRidge Stock remains above $0 in determining whether investing in Company Stock was and is appropriate for the Plan.  ERISA requires Defendants to scrutinize the risk of the Plan's investment in SandRidge Stock – based upon, *inter alia*, the public information upon which the stock price is based and the risk inherent in the stock – to protect the Plan's Participants' retirement savings.

---

[6] http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.

27.    Even if it may have been a reasonable investment for some investors, ERISA requires fiduciaries to avoid taking excessive risk with retirement assets.  After all, ERISA's fiduciary duties have been described as "the highest known to the law."  *In re Williams Cos. ERISA Litig.*, 271 F. Supp. 2d 1328, 1341 (N.D. Okla. 2003).

28.    The Plan Participants had every right under ERISA to expect the Plan's fiduciaries would act in their interest and protect them from unduly risky investments, whether in the form of Company Stock or any other asset.

29.    In failing to investigate, analyze, and review whether it was prudent to continue investment in SandRidge Stock in the Plan, Defendants acted with procedural imprudence.  Had Defendants conducted a prudent evaluation of whether SandRidge Stock was an appropriate investment for the Plan during the Class Period, and taken appropriate protective action – such as ceasing its purchase, divesting the Plan of SandRidge Stock, or any of the other actions as described below – Plan Participants would not have suffered such devastating losses to their retirement savings.

30.    Given the totality of circumstances prevailing during the Class Period, no prudent fiduciary would have made the same decision to retain the clearly imprudent SandRidge Stock as a Plan investment.

31.    This action is brought derivatively on behalf of the Plan pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), and seeks recovery of losses to the Plan for which Defendants are personally liable.  Because Plaintiff's claims apply to the Plan as a whole, inclusive of all Participants with accounts invested in Company Stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for Plan-wide relief for breaches of fiduciary duty such as those alleged herein, Plaintiff also brings this

action as a class action under FED. R. CIV. P. 23(b)(1) and (b)(2)  on behalf of all Participants and beneficiaries of the Plan whose Plan accounts were invested in SandRidge Stock during the Class Period.

## JURISDICTION AND VENUE

32.    ***Subject Matter Jurisdiction.***  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

33.    ***Personal Jurisdiction.***  This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

34.    ***Venue.***  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and one or more Defendants reside or may be found in this district.

## PARTIES

**<u>Plaintiff</u>**

35.    Plaintiff Barton Gernandt, Jr. is a former SandRidge employee.  He is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held shares of SandRidge Stock in his retirement investment portfolio during the Class Period. During the Class Period, the value of shares in SandRidge Stock within his Plan account diminished by several thousand dollars as a result of Defendants' breaches of fiduciary duty described herein.

**Defendants**

**Company Defendant**

36.    Defendant SandRidge is a Delaware corporation headquartered at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma.

37.    The Plan Document[7] lists the Employer – SandRidge – as a "named fiduciary" of the Plan.  *Id.* at 64, SRidge_00230.

38.    The provision continues, noting:  In general, the Employer shall have the sole responsibility for making the contributions provided for under the Plan; and shall have the sole authority to appoint and remove the Trustee and the Administrator; to formulate the Plan's "funding policy and method"; and to amend the elective provisions of the [Plan] Adoption Agreement or terminate, in whole or in part, the Plan.  *Id.* at 64, SRidge_00230.

39.    Moreover, the Plan Document specifies that the Employer "may appoint one or more Administrators," but that "[i]f the Employer does not appoint an Administrator, the Employer will be the Administrator."  *Id.* at 15, SRidge_00181.

40.    The Plan Document also discusses the Company's powers and responsibilities. *See id.* at 15-16, SRidge_00181-182.  Among the powers identified therein, SandRidge has the power "to appoint and remove one or more Trustees (or Insurers) and Administrators from time to time" and "appoint, at its option, one or more Investment Managers, investment advisers, or other agents to provide investment direction to the Trustee (or Insurer) with respect to any or all of the Plan assets."  *Id.* at 15, SRidge_00181.

41.    The responsibilities listed in the Plan Document include, *inter alia*, that SandRidge "shall establish a funding policy and method" and that SandRidge "shall periodically

---

[7]  Attached hereto as Exhibit 4.  The Plan Document is accompanied by the Adoption Agreement for the Newport Retirement Services, Inc. Volume Submitter 401(k) Profit Sharing Plan ("Plan Adoption Agreement"), SRidge_00121-161, attached hereto as Exhibit 5.

review the performance of any Fiduciary or other person to whom duties have been delegated or allocated by it under the provisions of this Plan or pursuant to procedures established hereunder." *Id.*

42.    At all relevant times, SandRidge acted through its officers and employees, including the Board of Directors, who performed Plan-related fiduciary functions in the course and scope of their employment.  Accordingly, the actions of the individual Defendants named herein and other employee-fiduciaries are imputed to SandRidge under the doctrine of *respondeat superior*, and SandRidge is liable for these actions.  Thus, Defendant SandRidge was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or control over the Plan's management and/or authority or control over management or disposition of the Plan's assets.

### Director Defendants

43.    At all relevant times, SandRidge acted through the Board of Directors.  As noted in the SandRidge Energy, Inc. Corporate Governance Guidelines, "[t]he basic responsibility of each director is to exercise his or her business judgment to act in what he or she reasonably believes to be in the best interests of the Company and its stockholders."[8]

44.    Defendant Tom L. Ward ("Ward") founded SandRidge and served as SandRidge's Chairman of the Board and Chief Executive Officer from June 2006 until his termination from SandRidge in June 2013.  He also served as President of SandRidge from December 2006 until January 2011.  Defendant Ward is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised

---

[8]  Available at http://sandridgeenergy.com/about/board-of-directors/board-of-directorscorporate-governance/.

13

discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

45.     Stephen C. Beasley ("Beasley") was appointed as a Director in 2013.  Defendant Beasley is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

46.     James D. Bennett ("Bennett") joined the Company in January 2011 and served as Executive Vice President and Chief Financial Officer until March 2013 when he was promoted to President and Chief Financial Officer.  In June 2013, Defendant Bennett was promoted to President and Chief Executive Officer.  Defendant Bennett was also appointed Director of the Company in 2013.  Defendant Bennett is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

47.     Defendant Jim J. Brewer ("Brewer") was appointed as a Director on February 28, 2011.  Additionally, since 2012 Defendant Brewer has been a member of the Audit Committee of the Board of Directors ("Audit Committee").  The Audit Committee oversees and reports to the Board of Directors on various auditing and accounting-related matters, including the maintenance of the integrity of the Company's financial statements, reporting process and internal controls, the selection, evaluation, compensation and retention of the Company's independent registered public accounting firm; the performance of internal audit, legal and regulatory compliance, including the Company's disclosure controls and procedures, and

oversight over the Company's risk management policies and procedures.  *See* DEF-14A filed on April 24, 2015.[9]  Defendant Brewer is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

48.    Defendant Everett R. Dobson ("Dobson") was appointed as a Director on September 24, 2009.  Additionally, since 2012, Defendant Dobson has been a member of the Audit Committee, serving as the Chair in 2012 and 2013.  Defendant Dobson is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

49.    Defendant William A. Gilliland ("Gilliland") was appointed as a Director in 2006 and served as Director until December 2014.  Defendant Gilliland is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets

50.    Defendant Daniel W. Jordan ("Jordan") was appointed as a Director in 2006 until 2013.  Specifically, on March 13, 2013, Defendant Jordan tendered his resignation to the Board of Directors, effective June 30, 2013, and on April 29, 2013, Defendant Jordan resigned from the Board effective immediately.  Defendant Jordan is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority

---

[9] *See also* Audit Committee Charter, Rev. Nov. 5, 2012, attached hereto as Exhibit 6.

to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

51.     Defendant Edward W. Moneypenny ("Moneypenny") was appointed as a Director in March 2013.     Additionally, Defendant Moneypenny has been a member of the Audit Committee since 2013, and currently serves as the Chairman.     Defendant Moneypenny is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

52.     Defendant Roy T. Oliver, Jr. ("Oliver") was appointed as a Director in 2006 and served as a Director until his resignation in February 2015.  Defendant Oliver is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

53.     Defendant Jeffrey S. Serota ("Serota") was appointed as a Director on March 20, 2007, and in June 2013 became the Chairman of the Board.  Moreover, Defendant Serota served on the Audit Committee in 2012 and 2013.  Defendant Serota is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

54.     Defendant J. Michael Stice ("Stice") was appointed as a Director on February 3, 2015.  Additionally, Defendant Stice  currently serves on the Audit Committee.  Defendant Stice is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C.

§ 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

55.    Defendant Alan J. Weber ("Weber") was appointed as a Director in March 2013. Defendant Weber is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

56.    Defendant Dan A. Westbrook ("Westbrook") was appointed as a Director in March 2013.  Defendant Westbrook is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

57.    Defendants Ward, Beasley, Bennett, Brewer, Dobson, Gilliland, Jordan, Moneypenny, Oliver, Serota, Stice, Weber, and Westbrook, are collectively referred to herein as the "Director Defendants."

**Benefits Committee Defendants**[10]

58.    The Plan Document notes that SandRidge "may appoint one or more Administrators" of the Plan.  Plan Document at 15, SRidge_00181.  The Plan Document further specifies that any such Plan Administrator(s) will be a "named Fiduciary" and that the Plan Administrator "shall have the sole responsibility for the administration of the Plan."  *Id.* at 64, SRidge_00230.

---

[10]  Identified above as the Employee Benefits and Compensation Committee.

59.    The Plan Adoption Agreement identifies the Benefits Committee as the Plan Administrator.  Plan Adoption Agreement at 3, SRidge_00123.

60.    The 2015 SPD also identifies the Benefits Committee as the Plan Administrator, and notes that as Plan Administrator, the Benefits Committee "is responsible for the day-to-day administration and operation of the Plan."  2015 SPD at 15, SRidge_00303.

61.    The Plan Document specifies that "[t]he primary responsibility of the Administrator is to administer the Plan for the exclusive benefit of the Participants and their Beneficiaries, subject to the specific terms of the Plan."  Plan Document at 16, SRidge_00182.

62.    Among the specifically enumerated "duties of the general administration of the Plan and powers necessary to carry out such duties," the Plan Document specifies that the Administrator is to "act as the named Fiduciary responsible for communicating with Participants as needed to maintain Plan compliance with [ERISA] § 404(c)."  *Id.*

63.    The 2010 Trust Agreement notes that "[p]ursuant to a delegation by the Board of Directors of the Company, the Company Employee Benefits and Compensation Committee is the Benefits Committee."  *Id.* at 2, SRidge_00077.  The 2010 Trust Agreement further identifies the Benefits Committee as the "committee or entity appointed in accordance with the terms of the Plan to make and effect investment decisions under the Plan and Trust."  *Id.*

64.    The 2010 Trust Agreement also contains an expanded discussion of the Benefits Committee's authority and responsibility, noting that the Benefits Committee "shall have the authority and responsibility for the management, disposition and investment of the Trust Fund." 2010 Trust Agreement at 6, SRidge_00080.  Moreover, the document specifies that the Benefits Committee "shall have responsibility for establishing and carrying out a funding policy and method as required by ERISA § 402(b)(1), consistent with the objectives of the Plan and the

requirements of ERISA." *Id.* Additionally, the Trust Agreement notes that the Trustee shall "implement, terminate, value, transfer to and from and allocate the gains, losses, and expenses among the Investment Funds in accordance with the proper directions of the Benefits Committee." *Id.*

65.    Defendant Mary L. Whitson ("Whitson"), SandRidge's Senior Vice President – Corporate and Human Resources since June 2011, signed the Plan's Forms 5500 filed with the Department of the Treasury, Internal Revenue Service, and Department of Labor ("DOL") for the plan years ending in 2011 and 2012 as the Plan Administrator. Upon information and belief, Defendant Whitson is a member of the Benefits Committee as evidenced by her signing the Plan's 2011 and 2012 Forms 5500 as the Plan Administrator. Defendant Whitson is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised control over Plan management and/or authority or control over management or disposition of Plan assets.

66.    Defendant Robert Scott Griffin ("Griffin") currently serves Senior Vice President – People and Culture after his appointment in November 2013. Defendant Griffin previously served as Director of Human Resources at SandRidge from 2008 to 2012. Further, Defendant Griffin signed the Plan's Forms 5500 filed with the DOL for the plan years ending in 2013 and 2014 as the Plan Administrator. Upon information and belief, Defendant Griffin is a member of the Benefits Committee as evidenced by his signing the Plan's 2013 and 2014 Forms 5500 as the Plan Administrator. Defendant Griffin is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised control over Plan management and/or authority or control over management or disposition of Plan assets.

67.    Defendant Cindy Green ("Green") is identified in the 2012 SPD as the Plan Administrator.  2012 SPD at 21, SRidge_00119.  Defendant Whitson is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised control over Plan management and/or authority or control over management or disposition of Plan assets.

68.    The identity of all the members of the Benefits Committee is currently unknown to Plaintiff.  *See supra* n. 4.  The Benefits Committee and all of its individual members, including but not limited to Defendants Whitson, Griffin, and Green, are fiduciaries of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

**Investment Committee Defendants**

69.    The 2015 Trust Agreement contains mirror provisions as the 2010 Trust Agreement except that it identifies the Investment Committee rather than the Benefits Committee as the "committee or entity appointed in accordance with the terms of the Plan to make and effect investment decisions under the Plan and Trust."  2010 Trust Agreement at 2, SRidge_00261.

70.    For comparison, the 2015 Trust Agreement contains the same expanded discussion of the Investment Committee's authority and responsibility as the 2010 Trust Agreement has for the Benefits Committee.  Specifically, the 2015 Trust Agreement notes that the Investment Committee "shall have the authority and responsibility for the management, disposition and investment of the Trust Fund."  2015 Trust Agreement at 12, SRidge_00271.  Moreover, the document specifies that the Investment Committee "shall have responsibility for establishing and carrying out a funding policy and method as required by ERISA § 402(b)(1),

consistent with the objectives of the Plan and the requirements of ERISA." *Id.* Additionally, the 2015 Trust Agreement notes that the Trustee shall "comply with directions of the Investment Committee." *Id.*

71.    The identity of all the members of the Investment Committee is currently unknown to Plaintiff. *See supra* n. 4. The Investment Committee and all of its individual members are fiduciaries of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised control over Plan management and/or authority or control over management or disposition of Plan assets.

**Additional "John Doe Defendants"**

72.    To the extent that there are additional Company officers, directors, and/or employees who were fiduciaries of the Plan during the Class Period, including members of the Benefits Committee and/or Investment Committee, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including, but not limited to, Company officers, directors, and employees, who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## THE PLAN

**Purpose**

73.    "The Plan is a defined contribution plan covering all eligible employees of SandRidge Energy, Inc. and its subsidiaries." *See* 2014 401(k) Form 11-K at 6. It became effective October 1, 1997. *See* 2015 SPD at 15, SRidge_00303. The amended and restated provisions of the Plan become effective on January 1, 2015. However, this restatement was

made to conform the Plan to new tax laws and contains some provisions that may be retroactively effective.

74.     The Plan year is defined to commence on January 1ˢᵗ and end on the immediately subsequent December 31ˢᵗ.  *Id.*

75.     The 2015 SPD makes clear that the purpose of the Plan is to "provide [participants] with the opportunity to save for retirement."  *Id.* at 1, SRidge_00289.

## Administration of the Plan

76.     As noted above, the Benefits Committee served as the Plan Administrator.  *See* Plan Adoption Agreement at 3, SRidge_00123; 2015 SPD at 15, SRidge_00303.

77.     The 2015 SPD notes that as Plan Administrator, the Benefits Committee "is responsible for the day-to-day administration and operation of the Plan."  2015 SPD at 15, SRidge_00303.

78.     "In addition to the general powers and responsibilities otherwise provided for in the Plan, [SandRidge] shall be empowered to appoint and remove one or more Trustees (or Insurers) and Administrators from time to time as it deems necessary…"  *See* 2014 401(k) Plan Document (the "2014 Plan Document") at 15, SRidge_00181.

79.     "The Primary responsibility of the Administrator is to administer the Plan for the exclusive benefit of the Participants."  *Id.* at 16, SRidge_00182.

## Eligibility to Participate

80.     As the 2014 401(k) Plan Document explains, employees who have reached the age of 21 and have completed one year of service with the company will become a Participant of the Plan, "no later than the earlier of (1) six (6) months after such requirements are satisfied, or (2) the first day of the first Plan Year after such requirements are satisfied."  *See* 2014 Plan Document at 18, SRidge_00184.

81.    The 2015 SPD reflects a change in these requirements, specifying that a participant is eligible when the participant reaches the age of 21 and has two consecutive months of service from the date of hire.  *See* 2015 SPD at 1, SRidge_00289.

**<u>Contributions</u>**

82.    The 401(k) Plan provided for the following types of contributions:

- Employee salary deferrals
- Employee matching contributions
- Employer "rollover" contributions

*See* 2015 SPD at 1, SRidge_00289.

83.    The 2015 SPD informed Participants that the total amount of deferred salary contributions a Participant could make to the Plan for any pay period could not be less than 1% and not exceed 75% of the employee's compensation for that period.  *Id.* at 2, SRidge_00290.

84.    If an employee made a deferred salary contribution for a payroll period, the 2015 SPD informed that the Company may make, "a discretionary matching contribution equal to a uniform percentage of [employee's] salary deferrals."  2015 SPD at 3, SRidge_00291.

85.    "[T]he Company made matching contributions to the Plan equal to a dollar for each dollar contributed by the participant up to 10% of the participant's eligible compensation (excluding performance bonuses) for each payroll period.   For a participant's performance bonus, the Company made dollar for dollar matching contributions to the Plan up to 15%."  *See* 2014 401(k) Plan Form 11-K at 6.  *See also* 2012 SPD at 6, SRidge_00104 ("While SandRidge reserves the right to change the match formula at any time, the match formula is anticipated to continue at 100% of salary and performance bonus deferrals of the first 15% of Compensation deferred each pay period.")

86. The 2012 SPD further noted that the Company Matching Contribution, "are made and invested in SandRidge Stock. If you have three years of service, you may choose to invest your matching contributions in any of the investments available in the Plan." *See* 2012 SPD at 6, SRidge_00104. *See also* 2014 401(k) Form 11-K at 14 ("Effective January 1, 2014, the Plan was amended to allow Participants to direct the investment of Company matching amounts upon completion of one year of service (formerly three years)").

**Vesting**

87. According to the 2012 SPD, "in order to reward employees who remain employed with SandRidge for a long period of time," a vesting schedule was applied to employer matched contributions. Specifically, matching contributions were vested 25% after one year and increased 25% each subsequent year thereafter until they were 100% vested after 4 years. 2012 SPD at 9, SRidge_00107. *See also* 2015 SPD at 5, SRidge_00293-94..

88. Participants always owned 100% of salary deferrals and rollover contributions. 2012 SPD at 9, SRidge_00107. *See also* 2015 SPD at 5, SRidge_00293.

**Investments Under the Plan**

89. The 2012 SPD informed Participants that matching contributions are made and invested in SandRidge Stock. *See* 2012 SPD at 6, SRidge_00104. According to the Notes to Financial Statements of the 2014 Form 11-K, a "significant portion" of the assets in the Plan consisted of Company Stock. Company Stock constituted approximately 34% and 36% of the Plan's net assets as of December 31, 2013 and 2012, respectively. "As a result of this concentration, any significant fluctuation in the market value of Company common stock could impact the net assets of the Plan as well as individual participant account balances." *See* 2014 401(k) Form 11-K at 12.

90.     For the Plan year ended December 31, 2011, the Plan offered 36 investment options, including SandRidge Stock. *See* 2011 Form 11-k at 15-17. For the Plan year ended December 31, 2012, the Plan offered 36 investment options, including SandRidge Stock. *See* 2012 401(k) Plan Form 11-K at 15. By the end of Plan year 2013, that number was down to 34, but still included Company Stock. *See* 2013 401(k) Plan Form 11-K at 14. For Plan year ending 2014, the Plan continued to offer 34 investment options, including Company Stock. *See* 2014 401(k) Plan Form 11-K at 14.

91.     As of December 31, 2011, the Plan held 3,420,306 shares of SandRidge Stock worth $27,909,697, or $8.16 per share. *See* 2011 401(k) Plan Form 11-K at 9.

92.     As of December 31, 2012, the Plan held 4,485,811 shares of SandRidge Stock worth $28,484,906, or $6.35 per share. *See* 2012 401(k) Plan Form 11-K at 9. During the Plan year ended December 31, 2012, the value of the Plan's investment in Company Stock dropped $6,838,520 although the number of shares increased by ***more than a million shares***. *Id.*

93.     As of December 31, 2013, the Plan's shares of SandRidge Stock had increased to 5,238,482 shares worth $31,797,586, or $6.07 per share, meaning for the second year in a row, while SandRidge Stock was artificially inflated, the Plan was a net purchaser of SandRidge Stock. *See* 2013 401(k) Plan Form 11-K at 9. During the Plan year ended December 31, 2013, the value of the Plan's investment in Company Stock dropped more than $1,150,734. *Id.*

94.     As of December 31, 2014, the Plan held 5,180,043 shares of SandRidge Stock worth $9,427,679 or $1.82/share. *See* 2014 401(k) Plan Form 11-K at 9. During the Plan year ended December 31, 2014, the Plan's investment in Company Stock lost an incredible $20,714,835 in value. *Id.*

95.     Assuming the Plan has not purchased additional shares of SandRidge Stock since year-end December 31, 2014, the value of SandRidge Stock as of the filing of the instant complaint would be roughly $2,849,023.65 based on the SandRidge Stock price of $0.63 as of July 29, 2015.  Thus, the value of SandRidge Stock in the Plan is worth just a fraction of its value from the start of the Class Period.

**The Trust**

96.     A Trust was established as a funding medium for the Plan, "consisting of the Trust Funds and such earnings, profits, increments, additions and appreciation thereto and thereon may accrue from time to time."  *See* 2010 Trust Agreement at 3, SRidge_00078.  *See also* 2015 Trust Agreement at 4, SRidge_00263.

97.     As explained in the 2014 Form 11-K, "Reliance Trust Company (the 'Trustee') is designated as the Plan's trustee and has delegated responsibility for the custody and management of the Plan's assets to Fidelity Investments (the 'Custodian') and The Newport Group (the 'Record Keeper'), respectively."  *See* 2014 401(k) Plan Form 11-K at 7.  *See also* 2013 401(k) Plan Form 11-K at 7; 2012 401(k) Plan Form 11-K at 8; 2015 Trust Agreement at 4, SRidge_00263 ("The Company hereby appoints Reliance Trust Company as Trustee of the Trust with respect to the Trust Fund.")

**Plan Fiduciaries Are Bound By ERISA's Strict Standards**

98.      If the fiduciaries of a plan know, or if an adequate investigation would reveal, that an investment option is no longer a prudent investment for that plan, then the fiduciaries must disregard any plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other, suitable, prudent investments.

99.     Despite the Plan's substantial investment in SandRidge Stock, Defendants failed to protect the Plan and its Participants from the decline in value of SandRidge Stock resulting

from the Company's misrepresentations and concealment of material information and the drastic

change in the Company's finances as detailed below.  Defendants not only continued to have the

Plan hold shares of SandRidge Stock, they compounded the problem and the Plan's losses by

having the Plan purchase additional shares during the Class Period.

## CLASS ACTION ALLEGATIONS

100.    Plaintiff brings this action derivatively on the Plan's behalf pursuant to ERISA

§§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and as a class action pursuant to Rules 23(a),

(b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, Plaintiff, and

the following class of similarly situated persons (the "Class"):

> All persons, except Defendants and their immediate family
> members, who were participants in or beneficiaries of the
> SandRidge Energy, Inc., 401(k) Plan at any time between August
> 2, 2012,[11] and the present (the "Class Period") and whose Plan
> accounts included investments in SandRidge Stock.

101.    The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiff at this time,

and can only be ascertained through appropriate discovery, Plaintiff believes there are at least a

couple of thousand employees of SandRidge who participated in, or were beneficiaries of, the

Plan during the Class Period and whose Plan accounts included investment in SandRidge Stock.

102.    For example, in 2011, there were 2,374 participants in the Plan.  *See* 2011 Plan

Form 5500 filed with the Department of Treasury Internal Revenue Service and the Department

of Labor.  In 2012, the number of participants in the Plan was 3,022.  *See* 2012 Form 5500.  And

---

[11]  Plaintiff reserves his right to modify the Class Period definition in the event that further
investigation/discovery reveals a more appropriate and/or broader time period during which
SandRidge Stock constituted an imprudent investment option for the Plan.

in 2013 and 2014, there were 3,177 and 2,351 participants in the Plan, respectively. *See* 2013 Form 5500 and 2014 Form 5500.

103.    At least one common question of law or fact exists as to Plaintiff and all members of the Class.  Indeed, multiple questions of law and fact common to the Class exist, including, but not limited to:

(a)    whether Defendants each owed a fiduciary duty to the Plan, Plaintiff, and members of the Class;

(b)    whether Defendants breached their fiduciary duties to the Plan, Plaintiff, and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plan, Plaintiff, and members of the Class have sustained damages and, if so, what is the proper measure of damages.

104.    Plaintiff's claims are typical of the claims of the members of the Class because the Plan, Plaintiff, and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of ERISA as complained of herein.

105.    Plaintiff will fairly and adequately protect the interests of the Plan and members of the Class because he has no interests antagonistic to or in conflict with those of the Plan or the Class.  In addition, Plaintiff has retained counsel competent and experienced in class action litigation, complex litigation, and ERISA litigation.

106.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter,

be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

107.    Class action status is also warranted under the other subsections of Rule 23(b)(1)(A) and (b)(2) because:  (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

### DEFENDANTS' FIDUCIARY STATUS

108.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

109.    ERISA treats as fiduciaries persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), and any other persons who in fact perform fiduciary functions (*e.g.*, *de facto* or functional fiduciaries).  Thus, a person acts as an ERISA fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

110.    During the Class Period, upon information and belief, each of the Defendants was a fiduciary – *i.e.*, either a named fiduciary or a *de facto* fiduciary – with respect to the Plan and owed fiduciary duties to the Plan and its Participants under ERISA.  As fiduciaries, Defendants

were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's Participants and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

111.    Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management, administration, and assets.    Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority for Plan management and authority assigned to or exercised by each of them and/or the specific exercise of authority or control over Plan assets by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority and/or exercise of authority or control.

112.    Instead of delegating all fiduciary responsibility for the Plan to external service providers, upon information and belief, the Company chose to assign the appointment and removal of fiduciaries, such as the members of the Benefits Committee and/or Investment Committee, to itself.

113.    ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions occurring, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan's sponsor.

114.    During the Class Period, all of Defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

**The Company Defendant's Fiduciary Status**

115.     Instead of delegating fiduciary responsibility for the Plan to external service providers, SandRidge chose to internalize certain vital fiduciary functions.

116.     Indeed, the Plan Document identifies the Employer – SandRidge – as a "named fiduciary" of the Plan.  Plan Document at 64, SRidge_00230.

117.     The provision continues, noting:  In general, the Employer shall have the sole responsibility for making the contributions provided for under the Plan; and shall have the sole authority to appoint and remove the Trustee and the Administrator; to formulate the Plan's "funding policy and method"; and to amend the elective provisions of the [Plan] Adoption Agreement or terminate, in whole or in part, the Plan.  *Id.* at 64, SRidge_00230.

118.     At all times, SandRidge acted through its directors, officers, and employees, including the Director Defendants, who performed Plan-related fiduciary functions in the course and scope of their employment.  SandRidge had, at all applicable times, effective control over the activities of its officers and employees, including their Plan-related activities.  Through its Board of Directors or otherwise, SandRidge had the authority and discretion to hire and terminate said directors, officers, and employees.  Accordingly, by failing to properly discharge their fiduciary duties under ERISA, the directors, officers, and employee fiduciaries breached duties they owed to the Plan's Participants.  Additionally, the actions of the Director Defendants and other employee fiduciaries are imputed to SandRidge under the doctrine of *respondeat superior*, and SandRidge is liable for these actions.

**The Director Defendants' Fiduciary Status**

119.     As noted above, the Director Defendants were responsible for appointing members of the Benefits and Investment Committees.  *See* 2010 Trust Agreement at 2, SRidge_00077.  Because the Director Defendants had the authority to appoint the members of

the Benefits and Investment Committees, and the Benefits and Investment Committees were responsible for managing the Plan's assets, the Director Defendants had the duty to monitor the activities of the Benefits and Investment Committees. As a result, the Director Defendants had the ultimate responsibility for removing Benefits and Investment Committee members if necessary.

120. The Director Defendants were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

**The Benefits Committee's Fiduciary Status**

121. As noted above, the Plan Document notes that SandRidge "may appoint one or more Administrators" of the Plan. Plan Document at 15, SRidge_00181. The Plan Document further specifies that any such Plan Administrator(s) will be a "named Fiduciary" and that the Plan Administrator "shall have the sole responsibility for the administration of the Plan." *Id.* at 64, SRidge_00230.

122. The Plan Adoption Agreement identifies the Benefits Committee as the Plan Administrator. Plan Adoption Agreement at 3, SRidge_00123.

123. The 2015 SPD similarly identifies the Benefits Committee as the Plan Administrator, and notes that as Plan Administrator, the Benefits Committee "is responsible for the day-to-day administration and operation of the Plan." 2015 SPD at 15, SRidge_00303.

124. Among the specifically enumerated "duties of the general administration of the Plan and powers necessary to carry out such duties, the Plan Document specifies that the Administrator is to "act as the named Fiduciary responsible for communicating with Participants as needed to maintain Plan compliance with [ERISA] § 404(c)." *Id.*

125.    Further, the 2010 Trust Agreement identifies the Benefits Committee as the "committee or entity appointed in accordance with the terms of the Plan to make and effect investment decisions under the Plan and Trust." *Id.* at 2, SRidge_00077.

126.    The 2010 Trust Agreement also contains an expanded discussion of the Benefits Committee's authority and responsibility, noting that the Benefits Committee "shall have the authority and responsibility for the management, disposition and investment of the Trust Fund." 2010 Trust Agreement at 6, SRidge_00080.  Moreover, the document specifies that the Benefits Committee "shall have responsibility for establishing and carrying out a funding policy and method as required by ERISA § 402(b)(1), consistent with the objectives of the Plan and the requirements of ERISA." *Id.*  Additionally, the Trust Agreement notes that the Trustee shall "implement, terminate, value, transfer to and from and allocate the gains, losses, and expenses among the Investment Funds in accordance with the proper directions of the [Employee] Benefits Committee." *Id.*

127.    Accordingly, the Benefits Committee and its members, including but not limited to Defendants Whitson, Griffin, and Green, were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

**The Investment Committee's Fiduciary Status**

128.    As noted above, the 2015 Trust Agreement contains mirror provisions as the 2010 Trust Agreement except that it identifies the Investment Committee rather than the Benefits Committee as the "committee or entity appointed in accordance with the terms of the Plan to make and effect investment decisions under the Plan and Trust." *Id.* at 2, SRidge_00261.

129.    The 2015 Trust Agreement also contains the same expanded discussion of the Investment Committee's authority and responsibility as the 2010 Trust Agreement has for the Benefits Committee.    Specifically, the 2015 Trust Agreement notes that the Investment Committee "shall have the authority and responsibility for the management, disposition and investment of the Trust Fund."  2015 Trust Agreement at 12, SRidge_00271.    Moreover, the document specifies that the Investment Committee "shall have responsibility for establishing and carrying out a funding policy and method as required by ERISA § 402(b)(1), consistent with the objectives of the Plan and the requirements of ERISA."  *Id.*  Additionally, the Trust Agreement notes that the Trustee shall "comply with directions of the Investment Committee."  *Id.*

130.    Accordingly, the Investment Committee and its members were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

131.    ERISA mandates that pension plan fiduciaries have a duty of loyalty to the Plan and its Participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.  As the Supreme Court "succinctly explained" in *Varity Corp. v. Howe*, 516 U.S. 489 (1996), "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries."  *Maez v. Mountain States Tel. and Tel. Inc.*, 54 F.3d 1488, 1499 (10th Cir. 1995) (citing *Varity Corp*, 516 U.S. at 506).

34

132.    During the Class Period, upon information and belief, certain Defendants, including the Director Defendants, made direct and indirect communications with the Plan's Participants and public at large, in which they omitted or misrepresented information regarding or materially related to investments in Company Stock.  These communications included, but were not limited to, conference calls with analysts, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions).  Defendants, including the Director Defendants, also acted as fiduciaries to the extent of this communication activity.

133.    Moreover, among the "duties of the general administration of the Plan and powers necessary to carry out such duties," the Plan Document specifies that the Administrator is to "act as the named Fiduciary responsible for communicating with Participants as needed to maintain Plan compliance with [ERISA] § 404(c)."  2015 SPD at 15, SRidge_00303.  The Benefits Committee and the Investment Committee and its members failed in their fiduciary obligations by failing to disclose materially relevant information regarding SandRidge's financial statements and financial condition, in their communications to Plan Participants via Plan documents like summary plan descriptions.

134.    Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press[12] concerning investment in company stock, including that:

---

[12] *See, e.g.*, David Blanchett, CFA, CFP, Morningstar Investment Management, "Employer Stock Ownership in 401(k) Plans and Subsequent Company Stock Performance," July 1, 2013 at 7; David K. Randall, "Danger in Your 401(k)," Forbes.com, Aug. 30, 2010, available at www.forbes.com/forbes/2010/0830/health-retirement-savings-erisa-danger-in-401k_print.html); Liz Pulliam Weston, "7 Ways to Mess Up Your 401(k)," MSN.com (Dec. 31, 2007), available at articles.moneycentral.msn.com/RetirementandWills/InvestForRetirement/7MostCommon401kBlunders.aspx); Joanne Sammer, "Managed Accounts: A new direction for 401(k) plans," Journal

(a)     Out of loyalty, employees tend to invest in company stock;

(b)     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(c)     Employees tend not to change their investment option allocations in the plan once made;

(d)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk;

(e)     Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards; and

(f)     No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely.

135.    Indeed, the Plan's massive investment of Plan assets in Company Stock (approximately 34% and 36% of the Plan's net assets available for benefits as of December 31, 2013 and 2012, respectively were invested in Company Stock) goes against the grain of best practices.  A recent article reporting on a survey of defined contribution plan sponsors noted that one company closed its company stock fund, which only accounted for 12% of the 401(k) plan's assets, to new contributions.  *See* 401(k) Plans Make Aggressive Moves to Limit Access to

---

of Accountancy, Vol. 204, No. 2, Aug. 2007, available at www.aicpa.org/pubs/jofa/aug2007/sammer.htm); Roland Jones, "How Americans Mess Up Their 401(k)s," MSNBC.com, June 20, 2006, available at www.msnbc.msn.com/id/12976549/); Bridgitte C. Mandrian and Dennis F. Shea, "The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior," 116 Q. J. Econ. 4, 1149 (2001), available at mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, "Investor behavior and the purchase of company stock in 401(k) plan - the importance of plan design," Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.), available at www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

Company Stock, March 4, 2013, Pension & Investments, available at http://www.pionline.com/article/20130304/PRINT/303049979/401k-plans-make-aggressive-moves-to-limit-access-to-company-stock. The reason given for doing so was because the company determined it "has 'a fiduciary responsibility to develop policies or procedures which help to provide protection for employees in an employer-sponsored plan.'" *Id.*

136.    Another company that halted new investments to the company stock fund noted that it did so to address a "fiduciary concern about people having too much stock in their 401(k) accounts." *Id.* And yet another company that halted new investments to the company stock fund stated the decision brings it in line with the company's "commitment to good governance and conflict of interest protections." *Id.*

137.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the substantial investment of the Plan's assets in SandRidge Stock, they still took no action to protect the Plan's assets from their imprudent investment in SandRidge Stock.

**FACTS BEARING UPON DEFENDANTS' FIDUCIARY BREACHES**

<u>Overview</u>

138.    SandRidge markets itself as "an independent oil and natural gas company" which concentrates on development and production activities in the Mid-Continent, Gulf of Mexico, and Permian Basin in west Texas. *See* SandRidge Annual Report (Form 10-K) for Year End 2012, at 1 (filed March 1, 2013). Its Exploration and Production segment explored for, developed, and produced natural gas and oil reserves with a focus on the Mid-Continent (also known as "Mississippian formation" or "Mississippian play") and the Permian Basin, a sedimentary basin largely contained in the western part of Texas and the southeastern part of New Mexico.

139.    SandRidge's founder and former Chief Executive Officer, Defendant Ward, founded SandRidge primarily as a natural gas company.  When natural gas prices started their downward spiral in 2008, the Company made a shift in strategy to transform itself from being a primarily low-margin natural gas producing company to a high-margin oil producing company.  The Company made several large acquisitions in connection with this transformation.

140.    A key piece of this strategy was the Company's acquisition of oil and gas production interests in the Mississippian play.  Beginning in 2009, SandRidge began acquiring and developing properties in the Mississippian play, and by 2012, the Company had acquired 1.7 million acres and spent over $2.2 billion developing those properties.

141.    From at least the beginning of 2011, the Company continuously stated that SandRidge was investing in the Mississippian play due to the large amounts of oil reserves and the favorable amount of oil relative to natural gas in the area.  The desire to give the illusion of having a larger concentration of oil rather than natural gas was because during this time period, oil prices were experiencing all-time highs while natural gas prices were in the midst of historical lows.

142.    Indeed, oil hovered around $100 per barrel between 2011 and 2014.  *See* Brad Plumer, "Why Oil Prices Keep Falling – and Throwing the World into Turmoil," www.vox.com, January 23, 2015 available at http://www.vox.com/2014/12/16/7401705/oil-prices-falling.  With oil prices high, "unconventional" oil production such as fracking, horizontal drilling and oil sand extraction became profitable.  *Id*.  It was only after hitting highs of $115 a barrel in 2014 that oil prices began to dive.  *See* Summer Said and Georgi Kantchev, "Global Demand for Oil is Increasing," *The Wall Street Journal*, June 12, 2015 at C-4.

143.    By comparison, after experiencing a boom in the early 2000s, the natural gas industry entered a downturn in the latter half of the 2000s.  In May 2012, the price of natural gas dipped below $2 per million British thermal units (mBtu), less than a sixth of the pre-boom price and too low for producers to break even.  *See* "Shale of the century," *The Economist*, June 2, 2012.

144.    As Plan Participants and the public at large would later discover, the Company wholly overstated the amount of oil relative to natural gas in the Mississippian play.  These misrepresentations resulted in the overstatement of the economic value of SandRidge's Mississippian play given the profitability of oil at the time, thus overvaluing the price of SandRidge Stock because of the undisclosed information.

145.    As detailed below, the Company Stock was further artificially inflated during the Class Period due to improper accounting for penalties under a service agreement it was a party to with Occidental.  In particular, after discussions with the staff of the Division of Corporation Finance of the Securities and Exchange Commission, the Company had to restate its earnings for 2013 through the first two quarters of 2014 because the Company did not use the appropriate accounting treatment with respect to the timing of accrual of liabilities under the Occidental service agreement.  Importantly, the individuals primarily responsible for the material misstatements were also the Plan's fiduciaries, namely, Defendants Brewer, Dobson, Moneypenny, and Serota who served on the Audit Committee – which among other things, oversees the maintenance of the integrity of the Company's financial statements, the Defendants. *See* Audit Committee Charter at 1.

146.    The artificial inflation of the Company Stock in and of itself made SandRidge Stock an imprudent investment vehicle during the Class Period.  But separately, SandRidge

Stock was imprudent during the Class Period because the Company's basic risk profile had altered dramatically from the deterioration of the Company's financial condition.

147.    In particular, leading up to the start of the Class Period, objective financial criteria indicated that SandRidge was at severe risk of bankruptcy.  Additionally, the decline of oil prices since 2014 has materially affected SandRidge's bottom line.

148.    Oil prices may never hit the highs they once did as the world's economy transforms its patterns of energy use.  *See* Amy Myers Jaffe, "Never Mind Peak Oil – Here Comes Peak Demand," *The Wall Street Journal*, May 6, 2015.  Executive director of energy and sustainability at University of California Davis and chairwoman of the Future of Oil and Gas for the World Economic Forum, Amy Myers Jaffe believes, "[e]xponential gains in industrial productivity, software-assisted logistics, rapid urbanization, increased political turmoil in key regions of the developing world and large bets on renewable energy are among the many factors that will combine to slow the previous breakneck growth of oil."  *Id.*

149.    Ms. Jaffe states that there is a consensus, "that a combination of policy inducements, energy taxes and technological break-throughs has resulted in a peak oil demand in the largest industrialized economies.  Europe's oil use in the last year hit its lowest level since the mid-1990s.  The U.S. Energy Information Administration declared 2007 as the peak year for oil use in the U.S. with demand expected to fall by between 1.8 million and 2.7 million barrels a day by 2035 based on improvements and demographic trends."  *Id.*

150.    Morgan Stanley has been pretty pessimistic about oil prices in 2015, drawing comparisons to the some of the worst oil slumps of the past three decades.  *See* Oil Warning: Crash Could Be Worst in More Than 45 Years, *http://www.msn.com/en-us/money/markets/oil-warning-crash-could-be-worst-in-more-than-45-years/ar-AAdnzF0?ocid=se*.

151.    The Economist also predicts that "unless some large-scale conflict erupts that takes out some of the world's biggest oilfields, the oil industry may be heading for a new normal in which the price of crude oscillates in the mid-double digits."  *See* Economist, "The Oil Industry After OPEC," p. 56, May 16, 2015.

152.    But SandRidge's problems go beyond just depressed oil prices.  As summed up recently:

> While the persistently weak oil price is at the center of SandRidge Energy's troubles, it is far from its only issue.  A more pressing issue is the gargantuan amount of debt it borrowed to fund its growth over the past few years.  ***It's debt that is becoming nearly insurmountable weight as the company doesn't stand a chance of drilling its way out of it as it had planned to do in years past***.
>
> After its most recent $1.25 billion debt issuance, ***SandRidge now has $4.6 billion in debt outstanding.  That's an incredible amount of debt and, for perspective, there are oil companies 10 times its size with similar levels of outstanding debt***.  Worse yet is the fact that the PV-10 value of SandRidge's reserves, or the present value of its proved reserves discounted by 10%, is a mere $3.04 billion at recent projected forward oil and gas prices.  ***It's an imbalance that suggests that SandRidge Energy could be insolvent if current prices persist***.

*See Is There Any Hope Left For SandRidge Energy Inc. Investors?*, Matthew DiLallo, available at http://www.fool.com/investing/general/2015/07/14 (emphasis added).

153.    Predictably, the aforementioned confluence of events has devastated SandRidge's financials.  The price of SandRidge Stock hit an all-time high of $68.54 on June 18, 2008.  By the start of the Class Period on August 2, 2012, the Company Stock had lost a whopping ***90%*** of its value.  For the full-year 2013, SandRidge reported a net operating loss of $169,001,000.

154.    The Company's financial condition, when viewed through the lens of objective financial metrics, plainly indicates the Company's deterioration over the last several years.

155.    In light of the Company's diminished financial prospects, resulting in a dramatic shift in the Company's basic risk profile, and the artificial inflation of SandRidge Stock through misleading and inaccurate statements, and improper financial accounting by the Company, SandRidge Stock was not a prudent Plan investment option during the Class Period. The Plan's fiduciaries knew or should have known this fact and should have taken steps to protect the Plan and its Participants. Sadly though, as set forth below, the Defendant-fiduciaries did nothing while the retirement savings of the Plan's Participants simply evaporated as a result of these fiduciary failures.

**SandRidge Misrepresented the Economic Value of Its Wells While the Company's Financial Condition Steadily and Significantly Declined Leading up to the Start of the Class Period**

156.    On February 24, 2011, the Company announced its financial and operational results for the fourth quarter 2010 and fiscal year ending December 31, 2010 in a press release, which it filed with the SEC on Form 8-K. In the press release, Defendant Ward emphasized the Company's successful transition from a primarily natural gas producing company to a primarily oil producing company: "We are now seeing the value of our transformation to oil…. Our oil reserves have more than doubled from year end 2009… We have grown oil production from 7,900 barrels per day in fourth quarter 2009 to over 28,400 barrels per day in fourth quarter 2010 and expect oil sales to generate about 80% of our revenues in 2011." Defendant Ward went on to state in pertinent part as follows:

> We have significantly enhanced our value with the early move to oil in two proven areas. We control 185,000 net acres in the Central Basin Platform in West Texas and have now leased 780,000 net acres in the Mississippian oil play in Northern Oklahoma and Southern Kansas. We expect to ultimately own over 900,000 net acres in the Mississippian as we wind down our leasing efforts in the first quarter. In both of these plays we develop shallow, permeable, carbonate reservoirs with decades of production history. As a result, our costs have remained low and

we do not expect to see the type of cost increases the industry is experiencing.

**We plan to drill over 900 wells in the Central Basin Platform and the Mississippian in 2011 where our average wellhead return is expected to exceed 90%.** We intend to fund this program with a combination of cash flow, proceeds from non-core asset sales and monetizing a portion of Mississippian acreage.

February 24, 2011 Press Release (emphasis added).

157.    After this press release, on February 25, 2011 the price of Company Stock increased from its February 24, 2011 closing price of $9.12 per share to close at $10.53 per share (approximately 15%) on extremely high volume.

158.    As would later be revealed, however, these statements were false and/or misleading because they failed to state the true amount of natural gas relative to oil in the wells.

159.    Throughout 2011 and 2012, the Company made representations in quarterly reports filed with the SEC, similar to those made in the February 24, 2011 press release, that falsely touted the economic value of the Company's wells in the Mississippian play, by among other things, omitting the true amount of natural gas relative to oil in SandRidge's wells.  For example, the Company filed its 2010 Annual Report on February 28, 2011 which reiterated the Company's financial results that were contained in the February 24, 2011 press release.  The Company also released its full-year 2011 results in which it similarly omitted any information regarding the true amount of natural gas relative to oil in the wells.

160.    At an April 17, 2012 presentation at IPAA's[13] Oil & Gas Investment Symposia, SandRidge provided the below slide that detailed the rates of return from drilling in the Mississippian play.

---

[13] Independent Petroleum Association of America.



161.   The import of the slide was as follows.  At $60 oil and $2.50 natural gas, a Mississippian well was projected to have an internal rate of return (IRR) of 30%.  At $80 oil and $2.50 natural gas, a Mississippian well was projected to have an IRR of 50%.  At $100 oil and $2.50 natural gas, a Mississippian well was projected to have an IRR of 80%.

162.   What stood out from this slide was how profitable a Mississippian well was projected to be with extremely low natural gas prices ($2.50) and quite low oil prices ($60).  The impact on investors was immediate.  As one investor later commented after seeing this slide, his "attraction to Sandridge was the massive acreage position the company had developed in the emerging Mississippian resource play."  *Seeking Alpha*, "What Happened to the Economics of SandRidge's Mississippian Wells?" Dec. 21, 2012, available at http://seekingalpha.com/article/1077891-what-happened-to-the-economics-of-sandridges-mississippian-wells.

163.    He continued, noting that the "economics of drilling wells into the play looked outstanding, so did the size of Sandridge's position (7,000 drilling locations) which was quite exciting." *Id.* According to the investor, "looking at this slide" made him think "that this must be one of if not the most economic resource plays in North America." *Id.*

164.    Unfortunately, as this investor and others like him would later find out, this was all an illusion.  As the Company later reported, there was much less oil in the Mississippian play than publicly acknowledged.

165.     There is no doubt that SandRidge and its officers and Board of Directors at all times knew the exact contents of the Mississippian play because it closely monitored and analyzed its wells.  SandRidge's Form 10-K for the year ended 2012 (filed on Mar. 1, 2013) stated in pertinent part as follows:

> SandRidge's Reservoir Engineering Department continually monitors asset performance, making reserves estimate adjustments, as necessary, **to ensure the most current reservoir information is reflected in reserves estimates**. Reserve information includes production histories as well as other geologic, economic, ownership and engineering data.  **The department currently has a total of 23 full-time employees, comprised of seven degreed engineers, one degreed geologist and 15 engineering analysts/technicians with a minimum of a four-year degree in mathematics, economics, finance or other business or science field**.

*Id.* at 7 (emphasis added).

166.    The status of SandRidge's reserves was formally presented at least once a quarter to senior SandRidge officials, including the Audit Committee:

> ***Each quarter, the Executive Vice President—Corporate Reserves and Acquisitions and Divestitures presents the status of the Company's reserves to a committee of executives, which subsequently approves all changes***. In the event the quarterly

updated reserves estimates are disclosed, the aforementioned review process is evidenced by signatures from the Executive Vice President—Corporate Reserves and Acquisitions and Divestitures and the Chief Financial Officer.

The Reservoir Engineering Department works closely with its independent petroleum consultants at each fiscal year end to ensure the integrity, accuracy and timeliness of annual independent reserves estimates. ***These independently developed reserves estimates are reviewed by the Audit Committee***, as well as the Chief Financial Officer, Senior Vice President of Accounting, Vice President of Internal Audit, Vice President of Financial Reporting, Treasurer and General Counsel and are approved as the Company's corporate reserves. ***In addition to reviewing the independently developed reserve reports, the Audit Committee annually meets with the third-party engineer at Netherland Sewell who is primarily responsible for the reserve report***. ***The Audit Committee also periodically meets with the other independent petroleum consultants that prepare estimates of proved reserves.***

*Id.* (emphasis added).

167. It was clear that by mid-2012, the Company, including the Board of Directors, by virtue of the Audit Committee's involvement in the verification process for the content of the Company's wells as detailed above, knew of the artificial inflation of Company Stock, and should have taken action to protect the Plan and its Participants from not purchasing artificially inflated Stock during the year.

168. It was equally clear that by mid-2012 the Company's basic risk profile had been significantly altered. Throughout the month of March 2012, oil and gas stocks stagnated, as a less than favorable demand outlook for crude oil weakened optimism in the exploration industry. Meanwhile, natural gas prices continued to hurt margins for natural gas explorers.

169. By the beginning of May 2012, SandRidge's stock price was slipping, down 4.7% to $6.91 per share.

170. On May 7, 2012, SandRidge reported its financial results for the first quarter of 2012, ending March 31, 2012. As stated therein, the Company reported a net loss of $216 million for this quarter. Additionally, the Company reported a loss to its cash and cash equivalents in the first quarter of 2012 – dropping to $127.8 million from $207.7 million in the last quarter of 2011, a loss of 38.5%.

171. There was additional evidence of the Company's precarious financial condition. The Altman Z-Score ("Z-Score"), developed in 1968 by Professor Edward Altman of the Stern School of Business at New York University, is a bankruptcy prediction model commonly accepted and used by financial analysts. *See National Wildlife Federation v. EPA*, 286 F.3d 554, 565-66 (D.C. Cir. 2002) (upholding Federal agency's use of Altman Z-Score analysis for predicting likelihood of bankruptcy and accepting that it "has been quite accurate over these last 25 years and remains an objective, established tool") (internal quotes and citations omitted).

172. A Z-Score greater than 2.99 is the "safe zone" meaning a company is unlikely to go bankrupt, a score of 1.88 to 2.99 is the "grey zone," and a score less than 1.88 is the "distress zone" where there is a high probability the company will go bankrupt within two years.

173. By March 31, 2012, SandRidge's Z-Score was a dismal *0.12* well within the distress zone. Moreover, the Company's debt-to equity ratio stood at 1.93 and would only go up from there.

174. On August 2, 2012, SandRidge announced its financial results for the second quarter 2012 and first six months of 2012 in a press release, which was filed with the SEC on Form 8-K. The August 2 press release highlighted certain items, including a statement that the "Mississippian daily average production grew 31% quarter over quarter and 199% from the comparable period in 2011." However, this statement did not disclose that the Company's

massive spending on drilling new wells in the Mississippian play enabled SandRidge to report increasing total oil production numbers in that area even though older wells with more production history experienced steep declines. This heightened drilling activity masked the rapid decline and depletion in SandRidge's horizontal Mississippian wells.

175.    The Class Period begins on August 2, 2012 because by this point in time, at the time of the announcement of the second quarter results, the Board of Directors, including the members of the Audit Committee, who had responsibility for appointing and monitoring the Benefits and Investment Committees, had the fiduciary obligation, and had been given a reasonable opportunity, to inform their appointees and the public at large of the Company's misstatements. Indeed, the Company had been issuing misstatements since at least the beginning of 2011. Moreover, to the extent members of the Benefits and Investment Committees were unaware of the Company's misstatements concerning the Mississippian play, given the resources available to the Benefits and Investment Committee as employees of SandRidge, a reasonable investigation by the Benefits and Investment Committees could and should have uncovered the truth about the Mississippian play no later than August 2, 2012.

176.    On August 2, 2012, Company Stock was trading at an artificially high $6.58 given the Company's concealment, of among other things, the truth about the Mississippian play.

177.    Additionally, and separately, by August 2, 2012, it was patently clear, or should have been clear, to the Plan's fiduciaries, including the Benefits and Investment Committees, that Company Stock was not a prudent investment option for the Plan's Participants given the Company's likelihood of bankruptcy, rising debt-to-equity ratio, and net losses as noted in its quarterly reports.

178.    Trust law states that "if the trustee holds property which when acquired by him was a proper investment, but which thereafter becomes an investment which would not be a proper investment for the trustee to make, it becomes the duty of the trustee to the beneficiary to dispose of the property within a ***reasonable time***."  *See* Restatement (Second) of Trusts § 231 (1959) (emphasis added); *see also* Introduction, *supra*.  Given what was at least known publicly to the Benefits and Investment Committees by August 2, 2012, these fiduciaries should have taken action to protect the Plan and its Participants.

179.    From this point forward, SandRidge and the other Defendants continued to issue misstatements about the Mississippian play, keeping SandRidge Stock artificially inflated.  The truth would only be revealed a few months later amid other bad news affecting the Company's bottom line.

180.    After the close of trading on November 8, 2012, SandRidge issued a press release disclosing the Company's financial results for the third quarter 2012, and reported a "net loss applicable to common stockholders of $184 million."  SandRidge also announced that it was "exploring the sale of its assets in the Permian Basin, other than those associated with the SandRidge Permian Trust" in order to raise capital.

181.    Additionally on November 8, a large activist SandRidge shareholder, TPG-Axon Capital, publicly issued a letter to the Company's Board of Directors calling for the resignation of Defendant Ward.  Specifically, the letter cited, among other things, SandRidge's "**disastrous performance**" and **over 76%** decline in its Stock price since its IPO in 2007.  Emphasizing that SandRidge had overpaid Defendant Ward with an "egregious" compensation of $150 million over the prior five years, the letter said that management's strategy with the Company has been "**incoherent, unpredictable and volatile**."  *See* "TPG-Axon Seeks Possible SandRidge Sale,

Ouster of CEO," *Reuters Hedgeworld (New York)*, Nov. 8, 2012.

http://www.reuters.com/article/2012/11/08/us-sandridge-tpgaxon-idUSBRE8A70UP20121108

(emphasis added).

182. On November 9, 2012, before the opening of the market, Defendants held a conference call for analysts and investors to discuss the financial results and other information set forth in the November 8, 2012 Press Release. On the call, Defendant Ward acknowledged that SandRidge had been overstating the value of its Mississippian assets over the previous two years, disclosing that, in reality, the Company's Mississippian formation assets consisted of far more low-margin natural gas deposits and far fewer high-margin oil deposits than the market had previously been led to believe:

> As we continue to grow the Mississippian well count across a larger area, we also are seeing an increase in our natural gas production. And this increase has been offset by a lower amount of oil than we anticipated at the beginning of last year.

183. Analysts were disappointed with the lower oil volumes and higher gas to oil ratio. On November 9, 2012, Global Hunter Securities noted in a research report on the Company that "[f]lowing lower-oil volume … through our valuation model substantially reduced our valuation estimate of $5 per share from $9," further noting that "[i]n response to this reduction in estimated equity value we are reducing our Buy rating to Neutral." Global Hunter Securities said:

> Not only did management announce plans to sell the Central Basin Platform assets, but it also informed the market that oil production from the company's other crown jewel asset, the Mississippian Lime, was not what they thought it would be. Specifically, what once was thought to be at least 45% oil resource from the Mississippian Lime now looks more like 40% oil. While Mississippian downspacing typically would be a positive development, in this instance it appears to be more like marginalizing an even larger asset.

*See* "Global Hunter Securities Downgrades SandRidge Energy to Neutral on Production Declines," *Benzinga.com*, Nov. 12, 2012.    http://www.benzinga.com/analyst-ratings/analyst-color/12/11/3080565/update-global-hunter-securities-downgrades-sandridge-ene.

184.    As a result of the disclosures on November 8th and 9th, 2012, the shares of SandRidge Stock declined from a closing price of $6.10 per share to close at $5.51 per share on November 9, a 34% decline from January 3, 2012.  These drops demonstrated that the Company Stock had been inflated due to the previously undisclosed information.

185.    A few days later at a November 13, 2012 Bank of America Merrill Lynch – Global Energy Conference, SandRidge showed the following slide which updated the economics of the Mississippian play compared to the economics depicted in the April 2012 slide described above:

## Two Great Plays (Mississippian – Bakken)







51

186.    The red line (top line in both graphs) represented what SandRidge as of November 2012 was representing as the economics of the Mississippian wells.  In this November presentation, at $60 oil and $4.25 natural gas, the IRR is estimated to be 25%.  Back in the April presentation, the IRR on a Mississippian well at $60 oil and just $2.50 gas was more than that, *i.e.*, it was estimated to be 30%.  In the November presentation at $80 oil and $4.25 natural gas the IRR is estimated to be 39%.  Back in the April presentation, the IRR on a Mississippian well at $80 and just $2.50 gas was more than that, *i.e.*, it was estimated to be 45%.

187.    As one investor noted, even with a 70% increase in the price of natural gas used in the November presentation to estimate the economics of the wells, the IRR had dropped.  *See Seeking Alpha*, "What Happened to the Economics of SandRidge's Mississippian Wells?" Dec. 21, 2012, available at http://seekingalpha.com/article/1077891-what-happened-to-the-economics-of-sandridges-mississippian-wells.  According to the investor, that "makes a big difference for investors wanting to determine how valuable this Mississippian play is to SandRidge.  This big change in economics is obviously a red flag and seems to be the result of the play being 'gassier'" than previously stated.  *Id.*

188.    Thus, it was clear that the Company's revelations in November 2012 had a material impact on how investors viewed the value of SandRidge.

189.    Throughout 2012, SandRidge produced a much lower percentage of oil than the Company had represented it would produce.  Indeed, oil commanded a significantly higher commodity price compared with natural gas in the market at the time – in general, wells that produce more oil and minimal gas generate more revenues than wells that produce mostly gas and low volumes of oil.  By overstating the oil and understating the gas percentage, and due to

the large price premium commanded by the market for oil versus natural gas, SandRidge misrepresented the performance of the wells and greatly overstated their economic value.

190.    Thereafter, things continued to decline for SandRidge and by mid-December, SandRidge Energy was downgraded to "Sell" by investment bank Canaccord Genuity.

191.    As a sign of its desperation, on December 19, 2012, SandRidge announced that it was selling its Permian Basin properties to Sheridan Production Partners for $2.6 billion in cash, following up on the plans it had announced in October in order to raise capital.  The sale of the Permian Basin caused SandRidge Energy to fall 4.8%, according to analysts at Tudor Pickering, and SandRidge shares were down over 20 percent by year end.

192.    As of December 31, 2012, SandRidge's Z-Score remained firmly in the distress zone at 0.20.  Further, the Company's debt-to-equity ratio was at an alarming 1.8 and increasing.

**SandRidge Continued Its Decline Throughout 2013**

193.    In early February 2013, JPMorgan downgraded SandRidge to "Underweight" as TPG-Axon's investigation of top management progressed.  JPMorgan predicted that regardless of the results that the TPG-Axon investigation would yield, "SD[14] seemingly has to go through ***extraordinary*** measures to avoid a financial crunch, and ***we think too much risk exists relative to the stock upside***."  *See* "JP Morgan Downgrades SandRidge Energy to Underweight on Risk/Reward," *Bezinga.com*, Feb. 5, 2013, available at http://www.benzinga.com/analyst-ratings/analyst-color/13/02/3304636/update-jp-morgan-downgrades-sandridge-energy-to-underwei (emphasis added).

194.    In March 2013, financial investment firm BMO Capital downgraded SandRidge to Underperform.  Following the downgrade, BMO Capital commented, "**the stock remains**

---

[14] SD is SandRidge's NYSE ticker symbol.

**significantly overvalued** as rates of return in the horizontal Mississippian Play aren't strong enough to support the current equity value, capital structure, and spending activity." *See* "BMO Capital Downgrades SandRidge Energy to Underperform, Expect Stock to Continue Downtrend," *Benzinga.com*, Mar. 7, 2013 (emphasis added).

195.    JP Morgan analysts remained skeptical of the future of the Company: "[W]e think [SandRidge's] **high debt level** and overhead expenses, even after possible spending and cost reductions, overwhelm the value of the assets." *See* "JP Morgan Maintains SandRidge at Underweight on the TPG-Axon Deal," *Benzinga.com*, Mar. 14, 2013. http://www.benzinga.com/analyst-ratings/analyst-color/13/03/3417515/update-jp-morgan-maintains-sandridge-at-underweight-on-t (emphasis added).

196.    On May 8, 2013, SandRidge reported its financial results for the first quarter of 2013, ending March 31, 2013, reflecting a loss for the first quarter that widened from the previous year, reflecting significantly higher expenses.  As reported therein, the Company reported a net loss of ***$531.3 million dollars***, $315 million more in losses since the same time in 2012.  SandRidge also cut its capital budget for the year to $1.45 billion, $700 million less than the Company spent in 2012, and less than the $1.75 billion it had previously said it planned to spend.

197.    Importantly, as bad as these numbers were, they would only get worse because for the entire 2013 and first two quarters of 2014, SandRidge would have to restate its financial results because it utilized improper accounting methodologies in preparing its results.

198.    On June 19, 2013, the Company announced that the Board had decided to terminate Defendant Ward as Chairman and CEO of the Company.  SandRidge replaced Defendant Ward with Chief Financial Officer of the Company, Defendant Bennett.

199.    By the end of the second quarter of 2013, SandRidge reported $506.6 million in losses for the first six months ending June 30, 2013. As of June 30, 2013, SandRidge's Z-Score was 0.26.

200.    On November 6, 2013, SandRidge reported its financial results for the third quarter of 2013, ending September 30, 2013. As reported therein, the Company reported $39 million less in total revenues from the same quarterly reporting in 2012. *See* Nov. 6, 2013 Form 10-Q at 6. The Company also reported a net loss of income of $54.6 million for the third quarter of 2013, totaling losses of $556.3 million for the nine month period ending September 30, 2013. *Id.*

**The Company's Struggles Continued and the Losses Mounted Throughout 2014**

201.    At the end of February 2014, SandRidge reported its financial and operational results for the quarter and year ended December 31, 2013. *See* Form 10-K filed Feb. 28, 2014. In its yearly filing, the Company reported its total revenue was down 28.6% from December 31, 2012. *See id.* at 58. Further, the Company reported a net loss of $514.5 million dollars. *See id.* at 52.

202.    SandRidge reported its financial results for the first quarter of 2014 on May 8, 2014, for the period ending March 31, 2014. *See* Form 10-Q, filed May 8, 2014. In its quarterly filing, the Company reported a loss in total revenues of $68.6 million as compared to the same quarter of 2013 – dropping to $443.1 million for the first quarter of 2014 from $511.7 million in the first quarter of 2013, a reduction of 13%. *See id.* at 6. SandRidge additionally reported a net loss of $134 million for the quarter. *See id.*

203.    As of March 31, 2014, SandRidge's Z-Score was at ***0.11***. Additionally, the Company's debt-to-equity ratio had risen to 1.9.

204. By the end of the second quarter of 2014, SandRidge reported that its total revenues had decreased by 27% since the same time in 2013, decreasing to $374.7 million in revenue for the three months ended June 30, 2014 from $513 million for the three months ended June 30, 2013. *See* Form 10-Q, filed Aug. 7, 2014 at 6. The Company additionally reported a net loss of $8.8 million for the quarter. *See id.* Collectively, for the first six months of 2014, the Company reported a net loss of $142.8 million. *See id.*

205. A few months later, the Company dropped a bombshell. On November 4, 2014, SandRidge announced in an Form 8-K that its financial accounting for the previous two years was being reviewed by the SEC. The review stemmed from the fact that pursuant to a 30-year treating agreement with Occidental Petroleum Corp., SandRidge supplies Occidental with carbon dioxide, which Occidental uses for enhanced oil recovery. *See* Nov. 4, 2014 Form 8-K at 2. Under the agreement, if SandRidge fails to deliver its contracted volumes, then it pays Occidental a penalty each year. Given that SandRidge supplies this carbon dioxide as a result of drilling natural gas wells, and drilling these new natural gas wells had not been profitable in recent years, the Company had been forced to pay Occidental this penalty each year. SandRidge had been accruing the penalty on an annual basis, but the SEC stated SandRidge had to accrue the penalty on a quarterly basis.

206. The Company stated that as a result of discussions with the SEC, "the Company is reconsidering its historical accounting treatment with respect to such accruals, and, in that regard, some or all of the liabilities associated with the Agreement previously recorded annually by the Company may be required to be re-recorded in one or more prior quarterly periods, which, in turn, could ***materially affect*** the net income previously reported for prior periods." Nov. 4, 2014 Form 8-K at 2.

207.    The Company further stated that:

As a result of the circumstances described above, on November 2, 2014, the Audit Committee of the Board of Directors of the Company concluded that (i) the consolidated financial statements of the Company for the periods ended December 31, 2012 and 2013 included in the Company's Annual Reports on Form 10-K for the periods then ended, with respect to which the Company received an unqualified opinion from its independent registered public accounting firm, PricewaterhouseCoopers LLP ("PwC"), and (ii) the unaudited consolidated financial statements of the Company for the periods ended March 31, 2013, June 30, 2013, September 30, 2013, March 31, 2014, and June 30, 2014 included in the Company's Quarterly Reports on Form 10-Q for the periods then ended **should no longer be relied upon due to potential changes related to the accrual of a liability associated with underdelivery by the Company of $CO_2$ to the Century Plant**.

*Id.*

208.    The effect of the announcement was immediate.  News of the restatement sent SandRidge shares tumbling more than 6.5% to a 52-week low of $3.56 by close of business on November 4, 2014, the day of the announcement.  As discussed below, the Company restated its financials in January 2015.

209.    In addition to the November 2014 revelation that SandRidge had to restate its financial statements, the Company continued to take more hits.  SandRidge stock closed at $2.10 on December 8, 2014 as oil prices fell to 5-year lows.  *See* "SandRidge Energy Stock Hits 52-week low After oil Prices Hit Five-Year Low," *TheStreet.com*, Dec. 8, 2014.

210.    The Company's Z-Score as of December 31, 2014 was a dismal *negative* 0.04.

**2015 Was a New Year But the Same Old Story for SandRidge**

211.    As noted above, SandRidge restated its financials on January 8, 2015 as a result of the SEC review.  The restated financials reflected changes in the accounting treatment for the Occidental contract impacting the first, second, and third quarters of 2013 by approximately $8

million of net income per quarter.  The first and second quarters of 2014 were also impacted by approximately $8 million of net income per quarter.

212.    The fact that the Company admitted that its financial statements for 2013 and the first half of 2014 ***could not be relied upon*** means the market did not accurately reflect the true value of the Company during that time period, as reflected in the price of Company Stock.  In other words, SandRidge Stock was artificially inflated during that time period.

213.    Additionally, the Plan's fiduciaries, in particular the Audit Committee, were the individuals at the Company responsible for the maintaining the integrity of the Company's financial statements.  *See* Audit Committee Charter at 1.  If anyone should have known about the improper accounting methodology utilized by the Company, it would have been and was the Audit Committee.  The Audit Committee Charter requires that "[a]t least one member of the Committee shall be an 'audit committee financial expert' as such term is defined in the rules adopted by the SEC and interpreted by the Board in its business judgment."  *Id.*  From 2013 to 2015, both Defendants Dobson and Moneypenny were designated as the "financial experts."  *See* Form DEF 14A filed for the years 2013 – 2014.  Despite their knowledge, Defendants did not take any steps to protect the Plan and its Participants from the enormous losses they incurred as a result of the Company's Stock price being inflated due to the accounting improprieties.

214.    SandRidge's restatements were not the only bad news for the Company in 2015.  The Company also reported its financial earnings for the third quarter 2014, ending September 30, 2014, on January 8, 2015.  As reported therein, the Company had total revenues of $394.1 million compared to $493.6 million during the same period the year prior, a drop of 20%.  *See* Jan. 8, 2015 Form 10-Q at 6.  SandRidge also saw its cash and cash equivalents drop nearly $20 million from the end of 2013, falling to $330 million from $349 million.

215.    There was more evidence of the Company's struggles.  In February 2015, the Company announced it was reducing its oil drilling operations, planning to slash its rig count in Kansas and Oklahoma by 75 percent.  *See* "Report: SandRidge to cut Kansas, Oklahoma rigs 75 percent," *Wichita Business Journal*, Feb. 10, 2015, available at http://www.bizjournals.com/wichita/blog/2015/02/report-sandridge-to-cut-kansas-oklahoma-rigs-75.html.  Specifically, SandRidge reduced its rigs on the Mississippian Lime formation in northern Oklahoma and Southern Kansas from 28 to just eight.  *Id.*  These moves, the article explained, "comes with oil prices falling more than 50 percent since June," as "operators have already begun slashing production budgets and abandoning plans for new exploration."  *Id.*

216.    This reduction of SandRidge's operations in Kansas represents a dramatic turn from the Company's prior plan of drilling 100 new horizontal wells in Kansas in 2014.  *See, e.g.*, "SandRidge Energy to drill 100 Kansas wells in 2014," *Wichita Business Journal*, Nov. 19, 2013, available at http://www.bizjournals.com/wichita/news/2013/11/19/sandridge-energy-to-drill-100-kansas.html.  And as the article concluded, this cutback of operations means "the [C]ompany's future in Kansas is uncertain."  Report: SandRidge to cut Kansas, Oklahoma rigs 75 percent," *Wichita Business Journal*, Feb. 10, 2015,

217.    SandRidge's flagging bottom line has also led the Company to lay off employees. For example, in February, SandRidge announced its plan to close the Odessa, Texas office of its subsidiary Lariat Services Inc., and eliminate all 265 positions there.  *See* "Chaparral Energy And SandRidge Energy Announce Layoffs," *Associated Press*, Feb. 4, 2015, available at http://kgou.org/post/chaparral-energy-and-sandridge-energy-announce-layoffs.

218.    On February 27, 2015, SandRidge reported its 2014 annual financial statements. As reported therein, for the year ending December 31, 2013, the Company reported a significant

decrease in cash and cash equivalents, totaling $181.3 million for 2014 as compared to $814.7 million in 2013, a reduction of 78%.  The Company additionally reported that total revenues also decreased by 21% in 2014, and oil and natural gas revenues had decreased by 22% since the end of the year prior.

219.    On March 31, 2015, SandRidge had an Altman Z-score of  *negative* 0.9142, placing it well in the distressed zone.  The Company's debt-to-equity ratio stood at *3.8*, meaning it had nearly *four* times as much debt as equity.

220.    The layoffs continued as the months progressed.  In April, Defendant Bennett said that SandRidge would be laying off 132 employees, a staggering 20% of the workforce at the Company's Oklahoma City headquarters.  *See* "SandRidge Energy to lay off 132," *NewsOK*, Apr. 2, 2015, available at  http://newsok.com/sandridge-energy-to-lay-off-132/article/5406709. The Oklahoma City layoffs came on the heels of SandRidge laying off 265 employees earlier in 2015 in the Permian Basin of west Texas.  *Id.*

221.    Referring to the Oklahoma City layoffs, Defendant Bennett cited declining oil and natural gas prices as the reason the Company was forced to adjust its workforce to align with, "the realities of a lower commodity price."  *Id.*

222.    The April layoffs were a purported attempt to shore up whatever was left of the Company according to Defendant Bennett.  *See* "First-round slide: SandRidge layoffs join string of industry job cuts due to low oil prices," *The Journal Record*, Apr. 2, 2015, available at http://journalrecord.com/2015/04/02/first-round-slide-sandridge-layoffs-join-string-of-industry-job-cuts-due-to-low-oil-prices-energy/.  Yet, at no time during these trying times did Defendant Bennett or the other Plan fiduciaries attempt to protect the Plan and its Participants as was their fiduciary obligation under ERISA.

223.    On April 21, 2015, TheStreet reported that SandRidge energy stock was "tanking" amid declining oil prices.  *See* Fukushima, Kurumi, *SandRidge Energy (SD) Stock Tanking Today    Amid    Declining    Oil    Prices*,    April    21,    2015,    available    at http://www.thestreet.com/story/13120696/1/sandridge-energy-sd-stock-tanking-today-amid-declining-oil-prices.html?puc=yahoo&cm_ven=YAHOO (last visited May 5, 2015).

224.    On May 7, 2015, SandRidge reported its first quarter 2015 financial results.  *See* SandRidge Energy, Inc. Form 10-Q, May 7, 2015.  As reported therein, during the first three months of 2015, SandRidge lost more than **$1.2 billion**, or 16.5% of its total assets as of yearend 2014.  *See* May 7, 2015 Form 10-Q at 4.

225.    The Company's oil, natural gas, and natural gas liquids revenues sharply declined for the three months ended March 31, 2015 compared to the same period the prior year.  Specifically, the revenues for 2015 amounted to $195,732,000 compared to $405,316,000 in 2014, a $209 million or 51.7% reduction.  *See id.* at 6.

226.    As expected, the Company's total revenue was similarly down.  Indeed, for the three months ended March 31, 2015, SandRidge's total revenue was down more than $227 million from the same period ended March 31, 2014, a 51.4% loss.  *Id.*

227.    All told, SandRidge had a net loss of ***$1,151,874,000*** for the first quarter of 2015. *See id.* at 8.  The Q1 2015 net loss was more than eight times the amount SandRidge lost during the same period in 2014.  *Id.*

228.    The Company's long-term debt also increased by $175 million or during the first three months of 2015, a 5.48% increase from yearend 2014.  *Id.* at 21.

229.    SandRidge's struggles had a dramatic and negative impact on SandRidge Stock, as the diluted loss per share for the three months ended March 31, 2015 was $2.19.  *Id.* at 34.

Thus, SandRidge Stock's loss per share for the first quarter of 2015 was ***more than seven times*** the diluted loss per share for the three months ended March 31, 2014 of $0.31. *Id.*

230.    One analyst saw SandRidge as having terrible assets that are worth nothing without the ideal pricing environment. *See* Dallas Salazar, "SandRidge – Abandon All Hope, Ye Who Enter Here," *SeekingAlpha.com*, June 8, 2015. SandRidge has spiraled out of control quickly and has not provided realistic guidance and has even struggled to detail its actual cost of operations. *Id.*

231.    In June, SandRidge laid off even more employees. As the Enid News in Oklahoma reported, SandRidge laid off 40 employees in its Alva, Oklahoma office, citing as a cause "the decline in the oil and gas industry drilling." *See* "Report: SandRidge Energy laying off 40 in Alva," *EnidNews.com*, June 10, 2015, available at http://www.enidnews.com/news/local_news/report-sandridge-energy-laying-off-in-alva/article_0058315a-0fe9-11e5-9ec9-3b4e1d4786af.html.

232.    On June 12, 2015, SandRidge's Stock price tumbled again with news of lower oil prices. *See* Shawn Ingram, "SandRidge Energy (SD) Stock Falls As Crude Oil Prices Slip," *TheStreet.com*, June 12, 2015. Oil prices fell "due to investors' concerns over Saudi Arabia's willingness to raise its oil production to record highs." *Id.* "Concerns over Greece's debt crisis also helped keep oil prices lower as they help keep the dollar strong against the euro." *Id.*

233.    Analysts from TheStreet noted that SandRidge's fall is, "driven by a few notable weaknesses," including: "deteriorating net income, generally high debt management risk, disappointing return on equity, weak operating cash flow and generally disappointing historical performance in the stock itself." *Id.*

234.    As another analyst put it:

No matter which way we slice it, SandRidge Energy is over its head in debt. After accounting for the recent debt issuance, SandRidge Energy now has roughly $4.6 billion in net debt outstanding. If we add in its equity market value and its preferred equity, the company's total enterprise value sits at roughly $5.7 billion.

To put that into perspective, SandRidge Energy now has almost as much net debt as EOG Resources, which is a company roughly 10 times its size, since EOG Resources has a $53 billion enterprise value. Another way to look at it, debt as a percentage of SandRidge Energy's enterprise value is 81% while it's only 9% of EOG Resources' enterprise value.

*Investopedia*, June 22, 2015.

235. This enormous debt-load spells doom for SandRidge. That is because its "mountain of debt alone suggests the company isn't built to last as it has almost as much debt as EOG Resources (*see supra*), a company nearly 10 times its size." *Investopedia*, June 22, 2015. Further, its problems are "compounded by the fact that the company's asset base simply can't produce returns on the same level as EOG Resources." *Id.* Accordingly, "[c]learly, the company faces a daunting task as it won't survive unless the price of oil moves meaningfully higher so that it can better support its mountain of debt." *Id.* But it is seriously doubtful if such a meaningful movement of oil prices is in the offing. As noted above, many analysts see the "new normal" as oil prices remaining in the mid-double digits. *See* Economist, "The Oil Industry After OPEC," p. 56, May 16, 2015.

236. Time may have run out for SandRidge. Significantly, on June 26, 2015, SandRidge reached a new low point when its Stock crossed the $1 threshold closing at $0.95 on that day. The stock price has remained well below $1 since that date, putting SandRidge Stock at risk of being de-listed from the New York Stock Exchange because the stock has traded below $1 for 30 consecutive days. *See* SandRidge Form 8-K, filed July 27, 2015. SandRidge Stock is

now effectively a "penny stock" trading in the mid $0.50 range as of the filing of the instant complaint.[15]

237.    A delisting of SandRidge's Stock would have disastrous consequences for the Company, its employees, and the Plan's participants.  As the Company itself stated, a delisting could "could negatively impact the Company by (i) reducing the liquidity and market price of the Company's common stock; (ii) reducing the number of investors willing to hold or acquire the Company's common stock, which could further harm the performance of the Company's common stock and negatively impact the Company's ability to raise equity financing; (iii) limiting the Company's ability to use a registration statement to offer and sell freely tradable securities, thereby preventing the Company from accessing the public capital markets; and (iv) impairing the Company's ability to provide equity incentives to its employees.  *See* SandRidge Form 8-K, filed July 27, 2015.

238.    As of the filing of the instant complaint, for all the reasons set forth above, SandRidge Stock has been and remains an imprudent investment option for the Plan.

**DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT SANDRIDGE'S STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLAN, YET FAILED TO PROTECT THE PLAN'S PARTICIPANTS**

239.    As illustrated by the following chart, SandRidge's tenuous financial condition as measured by, *inter alia*, its Z-Score and debt-equity ratio began in early 2012 and accelerated sharply in late 2014.

---

[15]  Penny stocks are loosely defined as "any stock that trades for pennies or those that trade for under $5."  *See* http://www.investopedia.com/terms/p/pennystock.asp.  Such stocks "are generally considered to be ***highly speculative and high risk*** because of their lack of liquidity, large bid-ask spreads, small capitalization and limited following and disclosure.  They will often trade over the counter through the OTCBB and pink sheets.  *Id.*



240.    Further, as the below graph of SandRidge's performance relative to the S&P 500 makes clear, the Company has severely underperformed the general market:



Source:
https://www.google.com/finance?chdnp=1&chdd=1&chds=1&chdv=1&chvs=maximized&chdeh=0&chfdeh=0&chdet=1437681600000&chddm=353153&chls=IntervalBasedLine&cmpto=INDEXSP%3A.INX&cmptdms=0&q=NYSE%3ASD&&ei=QiGxVaPmEsStjAHclbnoDg

241.    SandRidge is also radically underperforming when compared to the Oil, Gas & Consumable Fuels sector as well as the S&P 500 Index, having lost 92% of the share price in two and a half years compared to a sector increase of nearly 3% and S&P 500 index increase of 56%:



Source:
https://eresearch.fidelity.com/eresearch/markets_sectors/sectors/industries.jhtml?tab=learn&industry=101020

242.    Even when compared to the energy sector and S&P 500 index, SandRidge lags far

behind:



Source:
https://eresearch.fidelity.com/eresearch/markets_sectors/sectors/sectors_in_market.jhtml?tab=learn&sector=10

243.    The Company's financial condition, when viewed through the lens of objective

financial metrics, plainly indicates the Company's deterioration over the last several years.

During the Class Period, although they knew or should have known that Company Stock was an imprudent investment for the Plans, Defendants did nothing to protect the significant investment of the Plan Participants' retirement savings in the Peabody Stock Fund.

244.    Since the beginning of the Class Period through the filing of the instant complaint, the Plan's imprudent investments in SandRidge Stock have been decimated, as indicated below:



Source:

http://bigcharts.marketwatch.com/advchart/frames/frames.asp?show=&insttype=Stock&symb=s
d&time=100&startdate=8%2F2%2F2012&enddate=7%2F30%2F2015&freq=1&compidx=aaaaa
%3A0&comptemptext=&comp=none&ma=0&maval=9&uf=0&lf=1&lf2=0&lf3=0&type=2&st
yle=320&size=2&timeFrameToggle=false&compareToToggle=false&indicatorsToggle=false&c
hartStyleToggle=false&state=8&x=53&y=19.

245.    As a result of the enormous erosion of the value of SandRidge Stock, the Plan's Participants, the retirement savings of whom were heavily invested in SandRidge Stock, suffered unnecessary and unacceptable significant losses.

246.    Because of their high ranking positions within SandRidge – especially the Defendants who were members of the Audit Committee and Defendant Ward and Bennett who were the CEOs – and/or their status as fiduciaries of the Plan, Defendants knew or should have known of the existence of the above-mentioned problems.

247.    As a result of Defendants' knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning the true financial health of SandRidge, any generalized warnings of market and diversification risks that Defendants made to the Plan Participants regarding the Plan's investment in SandRidge Stock did not effectively inform the Plan Participants of the past, immediate, and future dangers of investing in Company Stock.  As a result, Plan Participants could not make informed decisions regarding whether to include SandRidge Stock in their accounts in the Plan.

248.    Additionally, because of SandRidge's exposure to losses stemming from the problems described above, Company Stock was imprudent no matter what its price.  The Company Stock price inevitably dropped drastically and steadily throughout the Class Period due to the pervasive problems facing the Company.  There was absolutely no objective evidence that the Company Stock price would or could recover.  Yet, Defendants failed to protect the Plan and the Plan's Participants from these foreseeable losses.

249.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in SandRidge Stock was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect Participants against unnecessary losses, and would have made different investment decisions.

250.    Because Defendants knew or should have known that SandRidge Stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its

Participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in SandRidge Stock.

251.    Defendants had available to them several different options for satisfying this duty, including, among other things:  making appropriate public disclosures as necessary; divesting the Plan of SandRidge Stock; discontinuing further contributions to and/or investment in SandRidge Stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by SandRidge they could not loyally serve the Plan and its Participants in connection with the Plan's acquisition and holding of SandRidge Stock.

252.    Despite the availability of these and other options, Defendants failed to take any action to protect Participants from losses resulting from the Plan's investment in SandRidge Stock.  In fact, the Defendants continued to invest and to allow investment of the Plan's assets in Company Stock even as SandRidge's problems came to light.

253.    In addition, upon information and belief, certain Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

## AT LEAST CERTAIN OF THE DEFENDANTS SUFFERED FROM CONFLICTS OF INTEREST

254.    Pursuant to the duty of loyalty, an ERISA fiduciary must discharge his duties solely in the interest of the participants and beneficiaries.  *See* 29 U.S.C. § 1104(a)(1)).  The Plan itself recognizes this important duty, stating that the Plan is to be administered "for the exclusive benefit of the Participants and their Beneficiaries, subject to the specific terms of the Plan."  Plan Document at 16, SRidge_00182.

255.    SandRidge's SEC filings during the Class Period, including Form DEF 14A Proxy Statements, make clear that a portion of certain directors' compensation, including Defendant Bennett, was in the form of stock awards and option awards.  For example, Defendant Bennett received the following grants of SandRidge Stock during the Class Period:

| Date | Stock Award |
|------|-------------|
| January 15, 2013 | 120,732 shares of restricted stock |
| February 15, 2014 | 273,011 shares of restricted stock |

*See* SandRidge Energy, Inc. Schedule DEF 14A, filed Apr. 24, 2015, at 45.

256.    Many of the other Director Defendants also received stock awards during the Class Period.  For example, on June 5, 2014, Defendants Beasley, Brewer, Dobson, Gilliland, Moneypenny, Oliver, Jr., Weber, and Westbrook received 22,059 shares of SandRidge Stock, and Defendant Serota received 29,412 shares of SandRidge Stock.  *Id.*

257.    Thus, certain Director Defendants were beneficial owners of SandRidge Stock, including Defendants Bennett, Beasley, Brewer, Dobson, Moneypenny, Serota, Weber, and Westbrook.  As of March 1, 2015, the Defendants' beneficial ownership was as follows:

| Defendant | Number of Shares Beneficially Owned |
|-----------|-------------------------------------|
| James D. Bennett | 1,065,315 |
| Stephen C. Beasley | 71,115 |
| Jim J. Brewer | 139,177 |
| Everett R. Dobson | 306,224 |
| Edward W. Moneypenny | 53,115 |
| Jeffrey S. Serota | 151,500 |
| Alan J. Weber | 53,115 |
| Dan A. Westbrook | 68,115 |

*Id.* at 51.

258.    Because of at least some of the Defendants' compensation in SandRidge Stock and ownership of SandRidge Stock, these Defendants had a conflict of interest which put them in the position of having to choose between their own interests as executives and stockholders, and

the interests of the Plan's Participants, whose interests Defendants were obligated to loyally serve with an "eye single" to the Plan. *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52 (1993); 29 U.S.C. § 1104(a)(1)(B). These Defendants, while attempting to shore up SandRidge during the Class Period as its stock price inevitably plummeted, abandoned their duties to the Plan and its Participants, and failed to consider at any time during the Class Period what was in the best interest of the Plan and its Participants as they should have done as Plan fiduciaries.

259.    Some Defendants may have had no choice in tying their compensation to SandRidge Stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan's Participants' retirement savings tied up to a large extent in SandRidge Stock or to take steps to protect the Plan and its Participants.

260.    Additionally, during the Class Period, Defendant Bennett sold a large quantity of SandRidge Stock. For example, Defendant Bennett's insider sales from February 1, 2013 through February 1, 2014 include:

| Date of Insider Sale | Number of Shares Sold | Value of Shares Sold |
|---|---|---|
| February 1, 2013 | 70,859 | $469,086.58 |
| July 8, 2013 | 8,850 | $43,099.50 |
| July 13, 2013 | 16,874 | $82,176.38 |
| January 13, 2014 | 8,015 | $47,368.65 |
| January 15, 2014 | 13,120 | $77,932.80 |
| February 1, 2014 | 67,824 | $417,117.60 |
| | | |
| **Total** | | $1,136,781.51 |

Source:  http://www.secform4.com/insider-trading/1443840.htm.

261.    Accordingly, in just one year, Defendant Bennett reaped over  $1.1 million from the sale of SandRidge Stock, while the Plan Participants' retirement savings plummeted. Indeed,

these insider sales occurred while SandRidge Stock was artificially inflated, thereby maximizing the benefit to Defendant Bennett.

262.    Thus, certain of the Defendants' interests were not aligned with those of the Plaintiff and the Plan.

## CLAIMS FOR RELIEF UNDER ERISA

263.    At all relevant times, Defendants are/were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

264.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

265.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

266.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

267.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the highest known to the law. *See In*

*re Williams Cos. ERISA Litig.*, 271 F. Supp. 2d 1328, 1341 (N.D. Okla. 2003) ("In supervising pension assets, plan trustees have fiduciary obligations that have been described as the highest known to the law.") (citing *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).  These duties entail, among other things:

(a)    the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b)    the duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c)    the duty to disclose and inform, which encompasses:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

268.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

269.    Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## COUNT I

### FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLAN'S ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405 BY THE COMPANY DEFENDANT, BENEFITS COMMITTEE DEFENDANTS, AND INVESTMENT COMMITTEE DEFENDANTS)

270.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

271.    This Count alleges fiduciary breaches against the Company Defendant, the Benefits Committee Defendants, and Investment Committee Defendants (the "Prudence Defendants").

272.    At all relevant times, as alleged above, the Prudence Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan and/or disposition of the Plan's assets.

273.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that all investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Prudence Defendants were responsible for ensuring that all investments in Company Stock in the Plan were prudent.  The Prudence Defendants are liable for losses incurred as a result of such investments being imprudent.

274.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.    ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).   Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct, or who are directed by the plan, including plan trustees, to do so.

275.    The Prudence Defendants' duty of loyalty and prudence also obligates them to speak truthfully to Participants, not to mislead them regarding the Plan or its assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan.   This duty to inform Participants includes an obligation to provide Participants with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plan investments/investment options such that Participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

276.    The Prudence Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, the Prudence Defendants knew or should have known that, as described herein, Company Stock was not a suitable and appropriate investment for the Plan.  Yet, during the Class Period, despite their knowledge of the imprudence of the investment, the Prudence Defendants failed to take any meaningful steps to protect Plan's Participants.

277.    The Prudence Defendants further breached their duties of loyalty and prudence by failing to divest the Plan of Company Stock during the Class Period when they knew or should have known that it was not a suitable and appropriate investment for the Plan.

278.    The Prudence Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding SandRidge's true financial condition and, generally, by conveying inaccurate information regarding the Company's future outlook.  During the Class Period, upon information and belief, Defendants fostered a positive attitude toward Company Stock, and/or allowed Participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning the imprudence of investment in Company Stock.  As such, Participants in the Plan could not appreciate the true risks presented by investments in Company Stock and therefore could not make informed decisions regarding their investments in the Plan.

279.    The Prudence Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses.  The Prudence Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

280.    As a direct and proximate result of the breaches of fiduciary duties during the Class Period alleged herein, the Plan and, indirectly, the Plan's Participants lost a significant portion of their retirement investments.  Had the Prudence Defendants taken appropriate steps to comply with their fiduciary obligations during the Class Period, Participants could have liquidated some or all of their holdings in Company Stock and thereby eliminated, or at least reduced, losses to the Plan and themselves.

281.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### BREACH OF DUTY TO AVOID CONFLICTS OF INTEREST
### (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405 BY THE DIRECTOR DEFENDANTS)

282.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

283.    This Count alleges fiduciary breaches against the Director Defendants (the "Conflicts of Interest Defendants").

284.    At all relevant times, as alleged above, the Conflicts of Interest Defendants were fiduciaries of the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

285.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty, that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

286.    During the Class Period, the Conflicts of Interest Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in Company Stock; and by otherwise placing their own and/or the Company's interests above the interests of the Participants with respect to the Plan's investment in the Company's securities.

287.    As a consequence of the Conflicts of Interest Defendants' breaches of fiduciary duty during the Class Period, the Plan suffered tens of millions of dollars in losses, as its holdings of Company Stock were devastated.  If the Conflicts of Interest Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses

suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and, indirectly, Plaintiff and the Plan's other Participants, lost a significant portion of their retirement investments.

288. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### COUNT III

### FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND PROVIDE THEM WITH ACCURATE INFORMATION (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY THE COMPANY AND DIRECTOR DEFENDANTS)

289. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

290. This Count alleges fiduciary breaches against the Company and Director Defendants (the "Monitoring Defendants").

291. At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

292. As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of other Plan fiduciaries.

293. Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and

holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

294.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to the plan's participants or for deciding whether to retain or remove them.

295.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

296.    During the Class Period, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    failing, at least with respect to the Plan's investment in Company Stock, to properly monitor their appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and inaction with respect to Company Stock;

(b)    failing to ensure that the monitored fiduciaries appreciated the true extent of the Company's precarious financial situation and the likely impact that financial failure would have on the value of the Plan's investment in Company Stock;

(c)    to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets and, in particular, the Plan's investment in Company Stock; and

(d)    failing to remove appointees whose performance was inadequate in that they continued to permit the Plan to make and maintain investments in the Company Stock despite the practices that rendered it an imprudent investment during the Class Period.

297.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.

298.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by those Defendants, and they failed to make any effort to remedy these breaches despite having knowledge of them.

299.    Therefore, as a direct and proximate result of the breaches of fiduciary duty by the Monitoring Defendants during the Class Period alleged herein, the Plan and, indirectly, the Plan's Participants and beneficiaries, lost tens of millions of dollars of retirement savings.

300.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their

breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

301.    The total SandRidge Stock price collapse of over **90%** since the start of the Class Period, as of the filing of the instant complaint, which devastated the Plan's assets, could have and would have been avoided in whole or in part by Defendants complying with their ERISA fiduciary duties.  Defendants could have taken certain actions based on the publicly known information alone such as, and not limited to:  investigating whether SandRidge Stock was a prudent retirement investment; retaining outside advisors to consult them or to act as fiduciaries; seeking guidance from governmental agencies (such as the DOL); resigning as fiduciaries of the Plan; stopping or limiting additional purchases of SandRidge Stock by the Plan; and/or by divesting SandRidge Stock held by the Plan.

302.    Despite these and other options, Defendants – who knew or should have known that SandRidge Stock was an imprudent retirement investment – chose to, as fiduciaries, continue allowing the Plan to acquire further SandRidge Stock, while taking no action to protect their wards as SandRidge's condition worsened and the Plan Participants' retirement savings were decimated.  Prudent fiduciaries would have acted otherwise and taken appropriate actions to protect the Plan and its Participants.

303.    To the extent Defendants wanted to take action based on non-publicly disclosed information that they were privy to, the following alternative options – which are pled as alternative statements under FED. R. CIV. P. 8(d)(2) to the extent they are inconsistent – were available to Defendants and (a) could have been done without violating securities laws or any other laws, (b) should have been done to fulfill Defendants' fiduciary obligations under ERISA, and (c) would not have been more likely to harm the Plan than to help it.

304.    First, Defendants could have and should have directed that all Company and Participant contributions to the Company Stock fund be held in cash rather than be used to purchase SandRidge Stock.  The refusal to purchase Company Stock is not a "transaction" within the meaning of insider trading prohibitions.  This action would not have required any independent disclosures that could have had a materially adverse effect on the price of SandRidge Stock.

305.    Second, Defendants should have closed the Company Stock itself to further contributions and directed that contributions be diverted from Company Stock into other (prudent) investment options based upon Participants' instructions or, if there were no such instructions, the Plan's default investment option.  There were significant new contributions in SandRidge Stock to the Plan during the Class Period.  While exact amounts are not disclosed in the Forms 11-K, the Plan acquired shares during the Class Period as noted *supra*.

306.    Defendants, in the exercise of their fiduciary duties, had discretion to cease purchasing additional SandRidge Stock.  Taking such a step would not have required any independent disclosures that could have had a material adverse effect on the Company Stock price.

307.    Given the relatively small number of SandRidge shares that might not have been purchased by the Plan in comparison to the enormous volume of actively traded shares, it is extremely unlikely that this decrease in the number of shares that would have been purchased, considered alone, would have had an appreciable impact on the share price.  For example, between year-end 2011 and 2012, the Plan had a net gain of nearly one million shares of SandRidge Stock.  On August 2, 2012, the start of the Class Period, the volume of SandRidge Stock available for trading on the open market was 24,857,800.

308.    Third, as courts have recognized, the speculative effect of a hypothetical disclosure is a counterfactual that requires discovery an expert testimony.

309.    Plaintiff believes that a less significant drop would have occurred upon earlier disclosure.  For example, it could well be that the market further discounted SandRidge Stock based upon the withholding of SandRidge's disclosures for months, treating it as something of a "black box" because investors feared that other risks were being hidden.  *See* King, R. "The Liar's Discount," *Forbes*, May 30, 1988 (suggesting that firms that obtain a reputation for being less than forthcoming about impending bad news trade at a discount to other stocks).  Thus, earlier disclosures would have, contrarily, caused investors to be willing to pay more for SandRidge's stock because they would have more comfort that management was forthright and nothing was being hidden.  *Id.* ("[g]etting bad news out fast and straight is perhaps the cardinal rule of effective public relations.")

310.    Alternatively, any drop from disclosure would have been no more than the amount of artificial inflation, and would have protected Plan Participants from making additional Company Stock purchases while the price of SandRidge's shares remained artificially inflated and unduly risky for retirement savings.  In short, disclosure would have prevented the purchases of additional shares at artificially inflated prices, necessarily helping the Plan.

311.    Additionally, because Defendants could and should have concluded that SandRidge Stock was an imprudent retirement savings vehicle based solely upon public information, no disclosure was required before conducting an orderly liquidation of the Plan's holdings.

312.    Defendants also could have:

- sought guidance from the DOL or SEC as to what they should have done;

- resigned as Plan fiduciaries to the extent they could not act loyally and prudently; and/or

- retained outside experts to serve either as advisors or as independent fiduciaries specifically for the Plan.

313. The Plan suffered tens of millions of dollars in losses during the Class Period because substantial assets of the Plan were imprudently invested, or allowed to be invested, by Defendants in Company Stock, in violation of Defendants' fiduciary duties, as reflected in the diminished account balances of the Plan's Participants.

314. Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and the Plan's Participants would have avoided a substantial portion of the losses that they suffered through the Plan's continued investment in Company Stock.

315. Given the totality of circumstances prevailing during the Class Period no prudent fiduciary would have made the same decision to retain the clearly imprudent SandRidge Stock as an investment in the Plan.

316. Despite the availability of these and other options, Defendants took no meaningful action during the Class Period to protect Participants from losses as a result of the Company Stock's imprudence. Sadly, now it is too late to make any substantial difference.

**REMEDIES FOR BREACHES OF FIDUCIARY DUTY**

317. As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

318. ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to

make good to such plan any losses to the plan…." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

319.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

320.    Plaintiff, the Plan, and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

321.    Each Defendant is jointly and severally liable for the acts of the other Defendants as a co-fiduciary.

## JURY DEMAND

Plaintiff demands a jury.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A.    A Judgment that the Defendants, and each of them, breached their ERISA fiduciary duties to the Participants during the Class Period;

B.    A Judgment compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.    A Judgment imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.    A Judgment awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

E.    A Judgment requiring that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in SandRidge Stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in SandRidge's stock price;

F.    A Judgment awarding costs pursuant to 29 U.S.C. § 1132(g);

G.    A Judgment awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.    A Judgment awarding equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated:  July 30, 2015                    Respectfully submitted,

                                         _/s/ Tanner W. Hicks_____
                                         **MATTINGLY & ROSELIUS, PLLC**
                                         Jason E. Roselius,  OBA No. 16721
                                         Tanner W. Hicks, OBA No. 31585
                                         13182 N. MacArthur Boulevard
                                         Oklahoma City, OK 73142
                                         Telephone:  405-603-2222
                                         Facsimile:  405-603-2250
                                         Email:  tanner@mroklaw.com
                                                 jason@mroklaw.com


                                         _/s/  Mark K. Gyandoh_____
                                         **KESSLER TOPAZ MELTZER & CHECK LLP**
                                         Edward W. Ciolko (*Pro Hac Vice to be requested*)
                                         Donna Siegel Moffa (*Pro Hac Vice to be requested*)
                                         Mark K. Gyandoh (*Pro Hac Vice to be requested*)
                                         Julie Siebert-Johnson (*Pro Hac Vice to be requested*)
                                         280 King Of Prussia Road
                                         Radnor, PA 19087
                                         Telephone:     (610) 667-7706
                                         Facsimile:     (610) 667-7056
                                         Email: eciolko@ktmc.com
                                                 dmoffa@ktmc.com
                                                 mgyandoh@ktmc.com
                                                 jsjohnson@ktmc.com

                                         *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 30, 2015, I sent a copy of the foregoing to the Clerk of Court

using electronic mail and provided a courtesy copy of the foregoing pursuant to ECF Policies &

Procedures Manual, § II.A.5.

  /s/ Tanner W.  Hicks
Tanner W. Hicks, OBA No. 31585
